PHILO C. CALHOUN, TRUSTEE, *vs.* JOSEPH RICHARDSON.

The defendant, a director and principal stockholder of an insurance company located in this state, was the owner of a large amount of bonds, which the president of the company, in a statement under oath as to the condition of the company, made before a commissioner acting in behalf of the comptroller of the state of New York, and for the purpose of being lodged with the comptroller, stated to be a part of the property of the company. At the time the affidavit was made the defendant signed a certificate appended to it, that all the statements of the affidavit were true so far as he had personal knowledge. The company soon after went into insolvency and the plaintiff was appointed trustee. In an action of trover brought by the plaintiff as such trustee for the bonds, it was held, 1. That evidence was admissible on the part of the defendant to show that he signed the certificate under a misrepresentation by the president as to the contents of the affidavit and with no knowledge that it stated that the bonds belonged to the company. 2. That, for the purpose of showing that he did what he could to prevent injury being done by the statement, the defendant might show that he

informed the commissioner, as soon as he learned the facts, that it was incorrect in respect to the bonds and that his certificate was obtained from him by imposition, and that he lodged a written statement to this effect with the comptroller.

It appeared that the defendant had shortly before signed a receipt which was held by the company, in which he acknowledged that the bonds were the property of the company and were held by him subject to its order; the receipt being given, as claimed by the plaintiff, as evidence of ownership in the company, to be used in making a report of its condition to the comptroller of this state. Held, that the defendant might show that he was not able to read writing, and that the receipt was obtained from him by fraud.

It was proved on the part of the plaintiff that the secretary of the company, soon after the receipt was signed, made a return to the comptroller of this state of the condition of the company, in which the bonds in question were stated to be a part of the assets of the company; such return being made under oath and in compliance with the requirement of law, which also required the publication of the substance of it, which publication was made in the city of Bridgeport where the company had its principal office and where the defendant resided. Held, that the defendant might show that he had in fact no knowledge that the bonds were represented by the return as the property of the company.

Held however, that the defendant might have been guilty of gross negligence, particularly as to the return, which should estop him from denying that the company owned the bonds, and that the question whether he had not been guilty of such gross negligence should have been submitted to the jury.

Where therefore the judge charged the jury, that, to be estopped from such denial, the defendant must have acted understandingly and intelligently, it was held that this instruction did not cover the case, and that the jury should have been told that if the defendant was guilty of gross negligence in allowing such a return to be made, he was estopped from denying the truth of its statements.

And it seems that a trustee in insolvency can avail himself of such an estoppel, although he represents all the creditors, and those creditors who became such after the making of the return, and who alone therefore could have trusted the company upon the credit gained by the return, were but a small portion of the whole number.

Remarks as to the liability of the directors of incorporated companies to the creditors and stockholders for their misconduct and negligence.

TROVER, brought by the plaintiff as trustee in insolvency of the Bridgeport Fire Insurance Company, for certain railroad and other bonds in the possession of the defendant and claimed to be a part of the assets of the insurance company.

The case was tried to the jury in the superior court on the general issue before *Waldo, J.*

It was proved on the trial that the defendant was one of the parties engaged in the organization of the insurance company, which was formed under a charter of incorporation in June, 1854; that he was a stockholder and director in the company

from its organization until the 15th day of April, 1858, when he tendered his resignation as a director, which was accepted by the company on the 17th of May, 1858, but that he continued to hold his stock until the company went into insolvency, which it did on the 27th of May, 1858, being deeply insolvent; that he attended all the meetings of the directors, from the 21st day of November, 1857, to the 1st day of March, 1858, and occasionally afterwards; that he was sometimes employed by the directors to examine into the condition of the property of the corporation in other cities and states, and that he reported the result of such examinations, and that for a considerable portion of the time after June, 1854, he resided in Bridgeport, where the company had its office.

The plaintiff offered evidence to prove that at the time of the commencement of the suit the defendant had in his possession twenty-six bonds of the Bridgeport Water Company, of the par value of $1,000 each; two bonds of the same company of the par value of $500 each; twenty-eight bonds of the first mortgage, and seventeen bonds of the second mortgage of the Harlem Railroad Company, each of the value of $1000; and seventeen of the first mortgage bonds of the New Jersey Central Railroad Company, of the par value of $1,000 each; all of which bonds were particularly described in the declaration, and which the plaintiff claimed had, previous to the insolvent proceedings, belonged to the company, and were now vested in him as a part of its assets. To prove the title of the company to these bonds, and his own title as trustee, the plaintiff offered in evidence the affidavit of one Nathaniel Green, then the acting president of the company, stating the condition of the company, bearing date the 2d of February, 1858, with a certificate signed by the defendant appended thereto, with proof that the affidavit and certificate were prepared for and delivered to Samuel B. Ruggles, Esq., of New York city, acting in behalf of the comptroller of the state of New York, as a commissioner to investigate the affairs of the company, which was at that time carrying on the business of insurance in the city of New York, and for the purpose of satisfying the comptroller of the solvency of the company, and

that the said Ruggles subsequently made a report, embracing the affidavit and certificate, which was lodged on file in the office of the comptroller. The material parts of the affidavit were as follows :—

" In the matter of the Bridgeport Insurance Company, examined under a commission issued by the comptroller of the state of New York, dated February 2d, 1858 :—

" Nathaniel Green, of the city of Bridgeport in the state of Connecticut, being duly sworn saith :—The above company was incorporated by the state of Connecticut in 1850. The deponent was one of the original stockholders. The company was not put in operation until the year 1854. The deponent was a director, and then was and ever since has been intimately acquainted with its affairs. The sum of one hundred thousand dollars required by the charter, as the capital of the company, was paid by subscription for that amount by this deponent and others. Since the first of October last the deponent has had the principal charge of the business of the company at Bridgeport, where he resides, so that he is perfectly cognizant of all its affairs. He is now the acting president of the company.        *        *        *        *        *        *

" Joseph Richardson was an original director of said company. He was an original subscriber for $10,000 in cash, and his note for $9,000 which the company now holds. During the year 1857 he gave to the company $36,000 in the bonds of the Bridgeport Water Company, $17,000 in the bonds of the New Jersey Central Railroad Company, and $45,000 in the first mortgage bonds of the New York and Harlem Railroad Company, in all $97,000, for which the company gave him, in addition to some other considerations, their own stock for $26,000, and $150,000 in the stock of the Hudson County Paint Manufacturing Company, with the understanding that they were to give him the further sum of $100,000 in said Paint Company stock on his paying them the further sum of $20,000. There was not and is not any understanding, agreement or contract of any kind between the said insurance company and the said Richardson that they were to return him any part of said bonds amounting to $97,000, as above

stated, nor has he any claim thereto, or lien thereupon, or right to recover or retake the same, or any part thereof, in any event, or under any circumstances whatever, but said bonds now belong absolutely and unconditionally to said insurance company, and no other person or company whatever has any claim thereto, or ownership therein, direct or indirect, present or contingent, subject however to this single explanation, that the company since the 18th of January last, and since the date of their report to the comptroller, wherein they stated their property to consist of, among other assets, $45,000 of the first mortgage bonds of the New York and Harlem Railroad Company, have exchanged seventeen of said bonds of $1,000 each, with said Richardson for seventeen other bonds of said railroad company, being second mortgage bonds, and which said seventeen bonds they now hold in lieu of seventeen of those specified in their said return. No portion of the assets of said insurance company, herein above specified, has been pledged, hypothecated, transferred or delivered to any person or corporation whatever.    *    *    *    *

"The item of $45,000 of bonds of the New York and Harlem Railroad Company, and of $15,000 of the bonds of the New Jersey Central Railroad Company, need no explanation. The market value of the property is known by constant and almost daily sales in New York.    *    *    *

"As to the item of $38,000 of bonds of the Bridgeport Water Company, the deponent states that the amount actually held by the Bridgeport Insurance Company is $36,000, in twenty-six bonds of $1,000 each, and two bonds of $5,000 each. The deponent is fully acquainted with the value of this property, having himself been the contractor for building the water works. They cost nearly $300,000, but by an act of the legislature of Connecticut the bonds issued to aid in their construction were declared to be the first lien on the property. $94,000 only of such bonds were issued, and by subsequent legal proceedings to foreclose the stockholders the whole of the works with all their appurtenances belong exclusively to the bondholders, who have since been incorporated as such. The water works now yield a yearly income of about

$7,000. The annual expenses are about $1,000. Any increase in the revenue will enure exclusively to the benefit of the bondholders. The deponent knows of no sale of the bonds in market, and therefore can state no market price for them, but he believes them to be fully worth par.    *    *    *

" In conclusion, the deponent begs leave expressly and distinctly to add, that he has intended to state, and believes he has fully stated, every fact or circumstance necessary or material to be known in estimating truly the condition of the Bridgeport Insurance Company, and the real value of its assets and state of its affairs.    (Signed)     NATH'L GREENE.

" *Subscribed and sworn to this 17th day of March*, 1858, *before me*,       SAMUEL B. RUGGLES,

*Commissioner in the matter above stated.*"

The certificate of the defendant, appended to the affidavit, was as follows :—

" I hereby certify that I have read the foregoing statement made and signed by Nathaniel Greene, and that I am the Joseph Richardson referred to in it, and that said statement is, to the best of my knowledge and belief, correct and true in all the matters of which I have personal knowledge therein stated.      (Signed)      J. RICHARDSON."

" In presence of THATCHER T. PAYNE."

To prove the signature of the defendant to the certificate the plaintiff offered Thatcher T. Payne, the attesting witness thereto, he being offered for no other purpose by the plaintiff, who on his cross-examination by the defendant's counsel testified that in the latter part of March, 1858, Nathaniel Green and the defendant came into his office in Wall street, New York, and requested him to witness the signature of Richardson to this certificate. Both the affidavit and certificate were in the hand-writing of Green. The defendant inquired if it was proper for him to sign the certificate. The witness inquired if there was anything in the affidavit of Green that related to any personal acts of the defendant. The defendant replied that he supposed there was not. This was in the presence of Green, who was then silent. Payne then dictated and Green wrote these words at the end of the certificate :—" In all

the matters of which I have personal knowledge therein stated." Green then remarked that there could be no objection to Richardson's signing the certificate, for his deposition contained only matters of form relating to the organization of the insurance company, and that he wanted it signed at once, for it was necessary that the deposition and certificate of the defendant should be delivered to Mr. Ruggles immediately. The defendant then signed the certificate. The affidavit was not read in the hearing of Payne. The whole transaction did not occupy over five minutes. The plaintiff objected to this testimony on the ground that it was irrelevant, but the court admitted it for the purpose of showing the circumstances under which the certificate was signed by the defendant.

The defendant offered himself as a witness to testify that he did not and could not read the affidavit of Green, and that he did not know at the time he signed the certificate what the contents of the affidavit were, but that he was assured by Green that it related entirely to the organization of the company, with which he was acquainted, and that relying solely on the assurance of Green he signed the certificate. To the admission of this evidence the plaintiff objected, but the court admitted it.

The defendant also offered evidence to prove that some few days after he signed the certificate, and while the same was in the hands of Mr. Ruggles, in the city of New York, he first learned the contents of the affidavit, and thereupon immediately informed Mr. Ruggles that the bonds described in the affidavit were not and never were the property of the insurance company, and that the certificate was improperly obtained from him, and was signed under a mistake as to the contents of the affidavit; that he afterwards went again to the office of Mr. Ruggles on the subject and found that he had gone to Albany; that with the said Payne he followed him to Albany, and requested him to return the certificate, or to permit him to place on file with it a written denial of the statement of Green in his affidavit as to the bonds; that the papers were then in the hands of the deputy chamberlain and had not been filed as an official document in the office of the comp-

troller of the state, and that Payne prepared and the defendant signed a written denial of the statement, and placed it in the hands of the deputy with the papers. To the admission of this testimony the plaintiff objected, but the court admitted it as tending to prove that as soon as the defendant discovered his mistake, and that the certificate had been improperly obtained from him, he took effectual measures to prevent its doing injury to others.

The plaintiff further offered evidence to prove, that in the month of January, 1858, the insurance company was in possession of an instrument in writing, purporting to be signed by the defendant, acknowledging that the defendant had received from the insurance company the bonds in question, and that he held them as the property of the company, subject to their order, and ready to be delivered to them on demand ; and that the secretary of the company, acting on this receipt and believing the same to be true, made a return of the assets of the company to the comptroller of this state in which he described the bonds as the property of the company. The defendant offered himself as a witness to testify that he had no recollection of ever signing such a receipt, and that if he ever did he did not know its contents when he signed it ; that he had signed receipts for small sums of money received from the company for personal services, and had done so without reading them, for he could not read writing, but that he did not know that he had ever signed any other receipts to the company. To the admission of this evidence the plaintiff objected, but the court admitted it.

The plaintiff offered in evidence a return made by the insurance company to the comptroller of this state, under the act of 1857, requiring the secretaries of insurance companies, annually on the first day of January, to make out under oath and deliver to the comptroller a true statement of the capital stock of each company, with a list of all its property, an abstract of which return shall be published in a newspaper in the county where the business of the company is carried on. The material part of this return was as follows :—

" *Statement under oath of the Bridgeport Insurance Com-*

Calhoun *v.* Richardson.

*pany of Bridgeport, on the first day of January*, 1858, *in conformity with the act of May Session*, 1857. 1st. Amount of capital stock. 2d. List of notes and endorsers thereon. 3d. Amount of stocks, bonds and mortgages, with the location of real estate named therein. 4th. All other securities and property, then held and owned as capital stock.

&ast; &ast; &ast; &ast; &ast;

" 38 Bridgeport water bonds,
45 Harlem Railroad 1st mortgage bonds,
15 New Jersey Central Railroad 1st mortgage bonds,

&ast; &ast; &ast; &ast; &ast; &ast;

Stocks and bonds valued at - $205,559.00

&ast; &ast; &ast; &ast; &ast; &ast;

" TIMOTHY HOUGH, *Secretary.*"

The oath of the secretary was appended to the return. In connection with this return the plaintiff offered proof that its contents were substantially published in a public newspaper of the city of Bridgeport, according to law ; that the insurance company continued to issue policies of insurance, and make renewals of policies previously issued, and to transact the ordinary business of insurance companies, until about the 1st day of May, 1858 ; and that after the issuing and publication of the return, and before the 1st day of May, the company made settlements of losses sustained both before and after the 1st of January, 1858, in which the time of payment was extended beyond the time when by the terms of the policies under which the losses accrued, the same would have become due, and also extended the time of payment on notes given for previous losses which had then become due ; that one of the policies so issued was dated January 1st, 1858, and was to a party residing in Bridgeport, and that upon it a loss occurred on the 24th of February, 1858, which was presented to and allowed by the commissioners on the assigned estate of the company, and that all the extended debts were presented to and allowed by the commissioners, and constituted a part of the indebtedness against the estate ; but it was admitted by the plaintiff that much the larger portion of the debts allowed by the commissioners accrued prior to the date of the return made to the comptroller, and prior to the time

when the plaintiff claimed that the transfer of the bonds from the defendant to the company took place.

The plaintiff claimed that under all the circumstances of the case the defendant was guilty of fraudulent misconduct, or gross negligence, in permitting the return to be made and published and the company to transact business as above, and requested the court to charge the jury that under such circumstances the defendant was estopped from denying the statements made in the return, and from claiming that the bonds were not the property of the insurance company.

The court charged the jury as follows : " An estoppel is defined to be where one by his words or conduct willfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, in which case he is concluded from averring against such party a different state of things as existing at the time. The word *willfully*, as used in this connection, is not to be taken in the limited sense of the term *maliciously*, or of the term *fraudulently ;* nor does it of necessity imply an active desire to produce a particular impression, or to induce a particular line of conduct. Let the motive be what it may, if one so acts or speaks that the natural effect of his words or conduct will be to influence another to change his condition, he is legally chargeable with an intent to induce the other to believe him and to act upon that belief. The question is this, have the conduct or admissions of the defendant caused any of the creditors of this company to believe that these bonds were the property of the insurance company, and have they induced any of the creditors to act on that belief so as to alter their previous position ; and have these acts of the defendant been understandingly and intelligently done by him, and have the admissions been understandingly and intelligently made ; for, whatever he may have done, in order to constitute an estoppel, it must have been done understandingly and intelligently, and with a knowledge of his own rights."

The jury returned a verdict for the defendant, and the

plaintiff moved for a new trial for error in the rulings and charge of the court.

*Hawley* and *Loomis,* in support of the motion.

1. The affidavit of Green, certified by the defendant as true, was a declaration made in behalf of the insurance company for official purposes—to obtain permission to do business in New York and as the foundation of the report to be made by the commissioner. It was a formal and important document, the representations of which the public were expected to rely upon, and which therefore in the highest degree required carefulness and accuracy. These representations were binding on the defendant and he ought not to have been allowed to contradict them. The trustee represents the creditors of the company, the precise class of persons for whom the representations were intended. His later acts in going to the comptroller to countermand the certificate can not annul it. It had already had its effect in being made the basis of the favorable report of the commissioner to the comptroller.

2. The defendant ought not to have been allowed to deny the truth of the facts stated in his receipt to the company, admitting that he held the stocks as the property of the company, nor the truth of the statements of the official return made by the secretary to the comptroller of this state. The receipt is important as being the basis of the secretary's affidavit that the bonds were the property of the company, and the evidence in his hands, if called upon to substantiate the statements of the return, that the company owned the bonds. The defendant, owing as a director of the company an important duty to the public and to the creditors of the company, a duty greater than he owed to the stockholders, can not be allowed to set up his own carelessness and negligence against the parties who have been misled by the statements of the return. It was his duty to know the contents of the receipt which he gave and of the return which was issued from the office of the company. The return was required by law, as also was its publication after it was made, and was to be made under oath by the secretary. The secretary of the company

Calhoun v. Richardson.

was subordinate to the directors, and it was their duty to see that he made the return. The defendant was not a mere nominal director, but was a leading and active director as well as principal stockholder, and he resided in Bridgeport where the company had its office and attended all the meetings of the directors. In these circumstances he can not avail himself of his ignorance of the contents of the return, when it was culpable negligence in him to be ignorant of them.

3. The judge should have charged the jury that, if the defendant was guilty of culpable misconduct or gross negligence in his position as director of the company, he was estopped from denying the truth of the facts stated in the return, although he was in fact ignorant of its contents. The judge told them that his act to estop him must have been "understandingly and intelligently" done. This may be the correct rule where a party is under no obligation to have the knowledge, as may be generally the case, but where it is the duty of a party to act understandingly if he acts at all, he can not set up in his defense the want of the knowledge which he ought to have possessed. This precise point is decided in *Preston* v. *Mann*, 25 Conn., 119; and see remarks of Storrs, J., on p. 129. And in the recent case of *Danforth* v. *Adams*, 29 Conn., 107, which is cited against us as showing that there can be no estoppel where the act was not expressly intended to be relied upon by the other party, the court say, per Hinman, J., p. 111, that the rule applies only "where there is nothing in the conduct or declarations of the party that can be imputed to him as culpable negligence." Here the negligence was of the grossest and most culpable kind.

4. The plaintiff can set up this estoppel, in behalf of the general creditors whom he represents. It is contended that as no party can take advantage of an estoppel in pais except the party whose conduct has been influenced by the representation of the party estopped, no advantage can be taken of it here except by the particular creditors of the company who have been led to trust it by reason of these representations. If this be the general rule yet the impossibility of applying it strictly here is a reason why it should not be strictly applied.

Shall each individual creditor sue the defendant and recover his own particular damages? And after the value of the bonds is exhausted shall the defendant still be personally liable for all judgments obtained against him thereafter? Such a rule might be far more injurious to the defendant himself. But we contend that, under the application of the ordinary rule, the plaintiff can take advantage of the estoppel. The representations of the return were intended for all persons who might be disposed to deal with the company. It will be presumed therefore that all persons dealing with the company have done so on the faith of these representations. All these persons are represented by the plaintiff. He is the only medium through which their rights can be asserted. The suit is not for damages for the false representations, but to recover the value of the bonds. The plaintiff claims that they were the property of the company. The defendant by the estoppel is prevented from denying that fact, and thus the bonds become in effect the property of the company. If they were the property of the company, all that property being now vested in him, he only can maintain a suit for them.

*Baldwin* and *Dutton*, with whom was *Beardsley*, contra.

1. Evidence was properly admitted to show the circumstances attending the signing of the certificate appended to the affidavit made before the New York commissioner by the president of the company. It was no objection to the inquiries made of Payne that they were made on cross-examination when he had been called by the plaintiffs to prove the defendant's signature. 1 Greenl. Ev., § 569. *Call* v. *Dunning*, 4 East, 53. *Manners* v. *Postan*, 4 Esp., 240. *Cussons* v. *Skinner*, 11 Mees. & Wels., 161. *Hollenback* v. *Fleming*, 6 Hill, 303. The plaintiff relied upon the paper as evidence of title, and the defendant had a right to show that it was obtained from him by fraud. He had a right also to show that so far as it contained an admission that the property belonged to the company, it was not willfully and intentionally made, and that therefore he was not estopped by it. *Danforth* v. *Adams*, 29 Conn., 107; and other authorities hereafter cited.

2. Evidence of the efforts of the defendant when he ascertained the facts as to the affidavit and his certificate, to correct the mistake and to prevent any injury from it, was properly admitted. If he had neglected to take these steps it would have been held to be a waiver of all objection to the certificate and an affirmation of it. The affidavit was intended as a continuing representation of facts with regard to the condition of the company, and it was the duty of the defendant to do what he could to prevent future injury, as it was also his right to protect himself as far as possible from further liability in the matter.

3. Evidence was properly admitted to show that the receipt claimed to have been given by the defendant to the company, was obtained from him by fraud, as well as that he was ignorant that the secretary of the company had represented the bonds, in his return to the comptroller, as belonging to the company. It was for the jury to say what weight to give to the evidence, but if the fact was as claimed by the defendant he had a right to show it. The defendant having been guilty of no willful intent in the matter is not estopped.

4. The charge of the court was right with regard to the question of estoppel. To conclude a party by his act in pais, it must have been designedly done, and with intent to influence the conduct of the other party. This rule is well settled. *Pickard* v. *Sears*, 6 Ad. & El., 469. *Brown* v. *Wheeler*, 17 Conn., 353. *Roe* v. *Jerome*, 18 id., 138. *Dyer* v. *Cady*, 20 id., 563. *Cowles* v. *Bacon*, 21 id., 451. *Preston* v. *Mann*, 25 id., 118. *Danforth* v. *Adams*, 29 id., 107. The case last cited expressly qualifies the doctrine in this respect. If the defendant was in fact ignorant of the statements of the return made by the secretary, then very clearly he can not have designed to make a representation that should influence the conduct of others, however negligent he may have been in not informing himself as to the return. The design which is essential to the estoppel can not have existed while there was an entire ignorance with regard to the return. It is no reply to say that he ought to have known what the return stated. It was not the duty of the *company* to make the return, and

so was no part of the defendant's duty as a director, but it is by statute made the personal duty of the *secretary* to make the return. Acts 1857, p. 24.

4. The plaintiff as trustee in insolvency of the company can not set up the estoppel. It is essential not merely that the act of a party, to estop him, shall have been designed to affect the conduct of another party, but that the conduct of the party has been in fact affected, and damage caused thereby. And no one can take advantage of the estoppel but the party thus affected. *Mechanics Bank* v. *N. York & N. Haven R. R. Co.*, 3 Kernan, 638. *Reynolds* v. *Lounsbury*, 3 Hill, 534. *Dezell* v. *Odell*, 6 id., 215. *Jackson* v. *Brinckerhoff*, 3 Johns. Cas., 101. *Pennell* v. *Hinman*, 7 Barb., 644. As to him it is inequitable that the other party should be allowed to deny the truth of what he has represented, but as to all the rest of the world there is no equitable reason against his showing the fact to be as it is. Taken as a mere admission, it is of no binding effect upon him. He may contradict the admission. It is only where the admission originally intended to influence another, has been acted on by that other, that the party becomes equitably bound by it. Here the trustee represents *all* the creditors. It does not appear from the motion that any of the creditors trusted the company upon the faith of this return, but if it be presumed that all who dealt with the company after the return was filed did so with knowledge of its contents and in the belief, induced by it, that these bonds belonged to the company, a presumption which we think can not be made, yet the number of creditors of this class is very small compared with the whole, so that, if a recovery is had by the plaintiff, it will be in greater part for the benefit of creditors who became such before the return was made, and who could have no right individually to set up the estoppel. As to them the question is one merely of *title* to the bonds, not of an estoppel to deny the title. The trustee under the statute, (Insolvent Act § 2, Stat. Comp. 1854, p. 513,) takes just what the insurance company could have assigned to him. Could the company have assigned these bonds, to which confessedly they had no title and which were not even in their

possession ? Supposing each creditor who has in fact trusted the company upon the faith of this return should bring an action against the defendant for the damage sustained by him through the defendant's negligence in permitting the representations to be made, would the judgment now recovered by the trustee be a bar to the action ? And if he relies upon the recovery by the trustee and brings no individual action, what equity is there in giving all the creditors the benefit of the recovery, when the few creditors who had given faith to the return would be entitled, if any body, to the whole of it ? The doctrine of estoppel is founded on equity and good conscience, and yet but a small part of the property would, by a recovery by the trustee, be secured to the creditors in whose favor the equity exists, while the property of the defendant, legally his, would be taken from him for the benefit of parties in whose favor no equity whatever exists or is claimed.

ELLSWORTH, J. This being an action of trover by the plaintiff as general assignee of the Bridgeport Insurance Company, it became necessary for him to prove a title to the bonds in question in the assignors. This he attempted to do by introducing an admission in writing or certificate signed by the defendant, appended to a deposition or affidavit of one Green, the president of the company, prepared for Samuel B. Ruggles Esq., who was acting for the comptroller of the state of New York as a commissioner for the investigation of the affairs of this insurance company. The affidavit gives a minute and extended inventory of the assets of the company in February, 1858, and among other things these bonds are put down as belonging to the company. As the defendant certified to the correctness of the inventory it was certainly an admission that the company at that time were the owners of the bonds, and that they did not belong to him, contrary to what he now claims. To meet the effect of this admission, the defendant claimed that the contents of the deposition were really unknown to him when he appended his certificate to it, that he could not read writing himself, and was misinformed by Green as to what he had stated in it, that in fact the whole pro-

ceeding was a fraud and imposition upon him, an advantage taken of his too great confidence in Green's integrity, and that his supposed assent to the truth of the affidavit ought not really to operate to his disadvantage. This explanation was objected to as irrelevant, but the court admitted it, and it went to the jury for what it was worth upon the question in dispute; which in our judgment was the proper course to be pursued by the court. The defendant had a right to weaken the force of, and, if possible, explain away entirely the admission which he was said to have made.

The defendant likewise offered himself as a witness, to testify that he was misinformed of the contents of the affidavit, as well as to explain how his signature came to be appended to the certificate. This too was objected to generally, but it was admitted, and we think rightly so, for the reason already assigned.

The defendant next offered to prove that a few days after he had signed the certificate, and while it was in the hands of Mr. Ruggles, he learned for the first time what were the contents of the affidavit, and that he had been imposed upon and made to admit by his certificate what was entirely untrue— that the bonds belonged to the Bridgeport Insurance Company and were not his own property; and that thereupon, in order to correct the error and prevent all persons from reposing confidence in the truth of the affidavit in this respect, he immediately informed Mr. Ruggles that he had been imposed upon by Green, that he never meant to certify to the truth of any such statement in the affidavit, and that the bonds were not and never were the property of the insurance company; and requested that the certificate might be returned to him, or that he might be allowed to file a denial of its correctness. To the admission of this evidence the plaintiff objected. Now if the objection was founded on the rule of law that the defendant can not be allowed to weaken the force of what he admits one day by denying it the next or thereafter, it could not be answered, and the evidence should have been rejected. But was this the case? We think it was not. Had the plaintiff introduced Green's affidavit with the defendant's certificate and

there stopped, the evidence might not have been admissible ; we are inclined to think it would not have been ; but the plaintiff did not stop there ; he introduced further and collateral proof to give character and stringency to the defendant's admission.    He claimed or might well have claimed to the jury that the affidavit and certificate were prepared in the most formal manner, and in their statement and verification of facts were entitled to very great weight—that it was a public document, intended for public use, and was left with Mr. Ruggles to continue to have the effect of an official verification of facts.    The defendant might well believe that if he said and did nothing to disabuse the comptroller of New York, after the imposition had been brought to light, his certificate would operate against him with much greater stringency—that such delay or omission to make known the fraud practiced upon him, could with good reason be urged upon the jury as showing that in fact there was no error or imposition, and no truth in the defense set up by him.    We do, not speak with great confidence of the correctness of the defendant's claim, nor of the views we entertain and have expressed, but if we err therein it is not an error of law, but in the application of the law to the case.

We see no objection to the defendant testifying that the receipt, which it was claimed he had given the company in January, 1858, purporting to be signed by him, acknowledging that the bonds were held by him for the benefit of the company, was unknown to him and a downright fraud practiced upon him.    The jury doubtless gave such weight to his testimony as they saw that it deserved.

There is another point which has given us more trouble, and which we are unable to dispose of without awarding a new trial ; we mean an omission in the judge's charge.

The plaintiff had introduced a certified copy of a return by the company to the comptroller of this state, together with evidence that the return had been published in a newspaper as required by law ; and that the company had continued to do business thereafter, on the credit which a return under the official oath of the secretary of the company, and its publicity

through the newspaper, was calculated to inspire. The return was dated January, 1858, and declared specifically that these bonds were part of the assets of the company. Now, the plaintiff insisted, that as the defendant was a director of the company at that time, as well as before and after, and regularly attended the directors' meetings, he must be held to have known the contents of this annual return, and to have assented to it as exhibiting the true situation and condition of the company's assets, and that under all the circumstances of the case the defendant was guilty of fraudulent misconduct or gross negligence in permitting the return if it was false to be made and published, and the company to transact business upon the credit of it; and he requested the court to charge the jury that under the circumstances the defendant would be estopped from denying the statements of the return. This claim, as presenting a principle of law, we think unobjectionable, and so we presume the judge himself considered it; for he proceeded to instruct the jury as to the nature and effect of an estoppel, and correctly enough told them that to estop the defendant his action must have been understandingly and intelligently had and his admissions understandingly and intelligently made, which is well enough as to the point of knowledge; but the judge says nothing about the effect of fraudulent conduct and gross negligence as estopping the defendant and subjecting him to damages. We think the defendant might have been unacquainted with the contents of the return to the comptroller, and yet possibly be liable on the ground claimed by the plaintiff. The plaintiff insisted that the defendant ought to have informed himself, and not to have given his sanction either directly or indirectly to the return, and afterwards set up a claim directly against it. We do not mean to say, as matter of law, that the defendant did sanction the return, or is liable under the circumstances for its false statements, but it was quite proper that the jury should pass upon the question whether the defendant had been guilty of *misconduct or gross negligence,* so that he should not be allowed to shield himself under the plea of ignorance. It is the summing up in the charge of the court to which we most

Calhoun *v.* Richardson.

object, as to the effect of gross negligence when there is not actual knowledge. Probably the view of the case which the judge took in his own mind was correct. He doubtless intended to respond fully to the claim of the plaintiff and supposed he had done so ; but, we think he failed to do it, and left the jury to infer from the concluding part of his charge that the defendant could not be estopped unless he had positive knowledge of the contents of the return.

We forbear to say what degree of neglect and inattention in the directors and officers of incorporated companies, in the duties for which they are appointed and which they are understood to engage to perform to some reasonable extent towards the stockholders and the confiding public, will subject them in damages. That is a delicate point to settle, and not likely to be correctly determined upon the common notions which seem to prevail too generally among certain classes in the community. Thousands of innocent and confiding stockholders, as well as strangers dealing with such corporations, have been utterly ruined by the inattention and negligence of the directors and officers, not to say by their flagrant mismanagement and fraud. The officers in our public and private institutions are solemnly pledged by the acceptance of office to the exercise of integrity and vigilance in discharging their trust, and, while the pledge is so often left unredeemed, it will do the community no harm for judges to hold the reins of accountability somewhat more tightly than they have been held for years past.

We advise a new trial.

In this opinion the other judges concurred.

NOTE.—The question which was discussed in the case, whether the plaintiff, being a trustee for the creditors generally, while but a small part of them had become such after the return of the secretary had been filed in the office of the comptroller, could take advantage of the estoppel, seems not to have been expressly decided by the court, though, as an opinion adverse to the plaintiff on the point would have disposed of the case and made a new trial of no advantage to him, it may be considered as fairly implied that the court held that the estoppel could be set up by him; and I have so stated in the head note of the case, though I feel it

my duty to call attention to the fact that it is my inference from the general conclusion of the court and not an express part of the opinion:

The question here presented is one of much interest and not without difficulty. It is not easy to see how, under any ordinary application of the principle of estoppel in pais, creditors can take the benefit of it who became such prior to the transaction out of which the estoppel grows, and who could not possibly in their dealings with the company have been influenced by the representations by which the party is sought to be bound. It is not altogether clear that, upon the ordinary rule as to estoppels in pais, creditors who became such after the representations were made, but who in fact never heard of them, can set up the estoppel; but it may not be an unreasonable presumption that all such creditors were influenced in trusting the company by the credit which it enjoyed with the public, and that these representations as to its assets had become in part the foundation of that credit, so that the party trusting the company had been indirectly influenced by the representations. This presumption is the more reasonable when it is considered that such representations are made less for their effect in detail and on particular individuals than for their general effect in the community and for the purpose of building up a general credit. But as to the creditors in whose favor no such presumption can possibly exist, it is difficult to see how the party making the representations can be estopped from denying their truth on the ordinary grounds of estoppel. It is a well settled principle with regard to estoppels in pais that the representations (or conduct operating as a representation) must have been designed or at least calculated to mislead the party dealt with, and that such party must have been actually misled and have acted upon the misapprehension to his injury. The vital part of this principle can have no application here.

It is not enough to say that the trustee represents the particular creditors who have the right to set up the estoppel and may recover for *them*, and that the court of probate may marshall the assets, giving to a part of the creditors the proceeds of that portion of the assets to which they have a prior or exclusive equity, as in the case of *Ashmead's Appeal from Probate*, 27 Conn., 241, because the bonds here in question would not become in any legal sense a part of *the assets of the estate*, which is essential to the application of the principle held in that case. If the bonds should not be exhausted in paying the particular creditors entitled to the benefit of them, the balance would not go to the rest of the creditors as assets. They would cease to be assets, and the original owner, no longer estopped from claiming them, would be entitled to a return of them. More than this, the particular creditors referred to would be entitled, not to the full benefit of the bonds, but to such a proportion of them as they would have received if the representation made had been in fact true, that is, to their pro rata share upon the basis of a division among *all* the creditors, which general division would have been made if they had been in fact the property of the company and a part of its assets.

All these difficulties grow out of the attempt to bring the case within the ordinary application of the principle of estoppels in pais. Is not the only solution of the difficulty to be found in taking the case out of that principle, and putting it on wholly other and higher ground? Does not the policy of the law, and not the principle of estoppel in pais, furnish the ground on which the case must rest? An estoppel in pais is not, as I regard it, founded in any proper sense on any policy of the law, like that policy which forbids gaming contracts, or contracts founded on immoral considerations, or contracts to do that which the law forbids. This

estoppel is founded purely on equitable principles, and on an equity existing be-tween the parties themselves. One party by his representations has induced an-other to adopt a certain course of conduct. If no damage results to the latter the law does not forbid the former to show that the representation was not true, but if damage results to the latter from which he can be saved only by the assumption that the represensation is true, he has an equitable claim on the former that he abide by his representation. The acting upon the faith of the representation by the latter party may be said to be the consideration, which gives legal effect to the representation of the other party as a contract; and there is hardly any case of estoppel in pais where the representation made is not substantially, and I am not sure that it is not legally, a warranty or promise, of which the change of conduct of the other party is the consideration. The conduct which estops a party must always be equivalent to a representation, and susceptible of being rendered into the formula of a promise or warranty.

The case should therefore, I conceive, be taken out of this mere equitable princi-ple and placed on the highest ground known to the law, that of its policy, founded on morality and the public good. The directors of corporations which are formed for the purpose of dealing with the public, and whose solvency and the good faith of whose transactions are of great importance to the public, should be held to the representations which they make to the public with regard to the condition of the corporations under their charge, whether the effect of such representations can be traced or not, and whether they have in fact produced any effect or have not. The directors are in a position to know the real fact, and ought to be presumed to know it. They are clothed with authority to speak for the corporation, and their representations made officially, and to a public officer of the state, and under the requirements of law, have an importance and a claim on the public confidence that ordinary representations would not have. Is it going too far to say, that if a cor-poration fails before another creditor has dealt with it, and if confessedly the repre-sentation has done no harm, the directors shall not be allowed to deny the truth of what they have affirmed? The point is not free from difficulty, and it is not with-out hesitation that I make this slight contribution to the discussion of it.     R.