ANDREW L. WINTON vs. NOAH R. HART AND ANOTHER.

A and B, a copartnership who were pecuniarily irresponsible, during a period of two months, the entire time during which they were in business, purchased all their goods, in successive parcels, of the plaintiff, a wholesale dealer at Bridgeport, on the credit of the defendants, but without their authority or knowledge. The goods were charged, billed and shipped to the defendants, the bills, by direction of A being sent to A and B, and, with the exception of the last parcel, were paid for by the defendants' checks. The defendants saw the bills for all the previous parcels before the last parcel was purchased, but did not notify the plaintiff that the dealing was unauthorized. Held, that the defendants were estopped to deny their liability for the last parcel,

ASSUMPSIT for goods sold and delivered; brought to the Court of Common Pleas, and tried on the general issue closed to the court (*Brewster, J.*) The court rendered judgment for the defendants, and the plaintiff moved for a new trial.

Early in May, 1868, one Edwin Wickwire entered into a copartnership with one Howe, under the company name of Howe & Wickwire, to carry on the milling business in Goshen, in Litchfield county, and about the same time Wickwire applied to the plaintiff, a wholesale dealer in grain, feed and flour at Bridgeport, and represented to him that he had recently formed a copartnership with Howe, under the name of Howe & Wickwire, and that they had hired a mill and were going into the business of manufacturing and selling grain, flour, feed, etc. Wickwire also represented that the defendants were interested in the copartnership, but their names did not appear in the business, as the defendants desired to keep this business separate and distinct from their other business in which they were largely engaged, viz: general merchandising, and requested the plaintiff to sell to the firm of Howe & Wickwire on the usual credit. Wickwire also informed the plaintiff that the defendants had arranged with the Housatonic Railroad Company to carry their goods to the depot at West Cornwall, the nearest railroad station to Goshen, at less than the regular rates of freight, and that the defendants had consented that Howe & Wickwire might have

their freight forwarded by said railroad in the name of the defendants, and thereby obtain the advantage of such reduced rates, and asked the plaintiff for that reason to send goods in the name of the defendants.

The plaintiff, knowing the defendants' firm to be by reputation a responsible one, and being wholly unacquainted with Howe & Wickwire, refused to sell to or upon the credit of Howe & Wickwire, but said he would sell to and upon the credit of the defendants, and send the goods to the defendants' address, and thereupon Wickwire then ordered goods upon the credit of the defendants to the amount of $273.50, and directed the bills to be sent by mail addressed to Howe & Wickwire. The goods were duly sent by railroad, directed to the defendants, and a bill for the amount made out against the defendants, "per Howe & Wickwire," was enclosed in an envelope addressed to Howe & Wickwire, and forwarded to them by mail.

On the 29th of May, 1868, Howe & Wickwire sent by letter a draft or check of the defendants for the amount of the first bill ordered, and by the same letter ordered another bill of goods to the amount of $172.50, directing them to be sent as before to the defendants, and the bill sent to Howe & Wickwire. The plaintiff made out the bill to the defendants, and forwarded it and the goods in the same manner as was done in the first instance.

On the 12th of June, 1868, Howe & Wickwire sent by mail another order for goods, and on the 30th of June one other order, both amounting to $305.00, and directed the same to be shipped as before, and they were shipped, addressed, billed, and the bill sent, in the same way as was done in the first instance, all which goods were paid for by checks or drafts of the defendants payable to the plaintiff or his order.

On the 31st of July, 1868, the plaintiff received a letter from Wickwire ordering more goods to the amount of $390.13, and stating that Howe was not then with him in business, and directing the goods to be shipped to himself or to the defendants. The plaintiff shipped the goods on the 1st of August, 1868, by the Housatonic railroad, billed, marked and

addressed to the defendants, and made out his bill against them, and sent it by mail addressed to them. The goods reached their destination on the 3d of August, 1868, and the bill was received by the defendants on the same day. The defendants were not in fact interested as partners in the firm of Howe & Wickwire, nor were Howe & Wickwire, or either of them, authorized to purchase goods on the credit of the defendants, and Wickwire was known by them to be pecuniarily irresponsible. They had lent Howe some money for the benefit of his firm, and purchased goods of the firm from time to time as they needed them. The defendants were the only persons in that immediate neighborhood who kept a bank account, and were in the habit of furnishing checks or drafts to those who needed them for the purpose of remitting money to others at a distance.

At the dissolution of the firm of Howe & Wickwire, just prior to July 31st, 1868, they applied to the defendants for a draft or check to remit to the plaintiff in payment of the last bill then contracted of him, and the defendants then saw bills for all the different parcels of goods that had been furnished, and then first learned that the bills had been made out against them. On noticing the charges so made, the defendants inquired of Wickwire how the goods came to be charged to them on the bills sent to Howe & Wickwire, and Wickwire replied that he did not know, and the defendants supposed the mistake had arisen from inadvertence on the part of the plaintiff.

The defendants had an arrangement with the railroad company by which freight addressed to them was charged at less rates than were charged for other freight not so addressed. The defendants had permitted Howe & Wickwire to have the goods, which the defendants supposed they were purchasing on their own credit, shipped, addressed to the defendants, and thereby Howe & Wickwire obtained the advantage of the lower rates of freight.

About half of the last consignment of goods sent by the plaintiff was taken from the depot to Wickwire's mill by teamsters, under a general understanding that they should

convey his freight from the depot. After this portion had been so conveyed, the portion which remained was becoming heated and damaged, and one of the defendants, on August 9th, upon information given him by one of the teamsters of the condition of the grain at the depot, and at request of Wickwire who was about to leave town for two or three days, instructed the teamster to cart the grain to Wickwire's mill with as little delay as posssible. The teamster carried a portion of the grain to the mill on the same day, and the remainder several days thereafter.

The defendants never authorized Howe & Wickwire, or either of them, to procure any goods on their credit, and never had any interest in the milling business, or in the grain sent by the plaintiff, and in all of the transactions acted in entire good faith. The defendants paid to the railroad company the freight with their other freight bills. The goods were appropriated by Wickwire, and none of them came to the use of the defendants, except some small quantities of feed which were purchased of Wickwire by the defendants, and used by them in the ordinary course of their business.

*Seeley* and *Sanford*, in support of the motion.

*DeForest*, contra.

BUTLER, C. J. This case turned in the court below, and hinges here, upon a question of estoppel.

It is found that Howe & Wickwire commenced the business of purchasing and grinding grain in May, 1868, with the assistance and encouragement of the defendants, and that they purchased all their grain in several successive parcels, from that time until July following, of the plaintiff, who was then a wholesale dealer in grain at Bridgeport, on the credit of the defendants, but without their authority or their knowledge. The parcels of grain were shipped to the defendants, and previous parcels were paid for by the checks of the defendants. The parcels were charged and billed to the defend-

ants, but the bills, by direction of Wickwire, were sent to Howe & Wickwire. The defendants saw these bills before the parcel of grain in question was purchased, but did not notify the plaintiff that the dealing was unauthorized.

On these facts are the defendants estopped to deny that they authorized the purchase of the parcel in question on their credit?

It is well settled that a man cannot lawfully keep silent when it is his duty to speak to prevent a wrongful use of his property or credit to the injury of an innocent third person. He cannot therefore be permitted to keep silent when he knows that his property is being fraudulently sold by another as his own, without warning the innocent purchaser; or when he knows that his credit is being fraudulently used by an irresponsible person in the purchase of goods, without notifying the vendor of the fraud. To do so is *culpable negligence*, and as much an element of estoppel as active misconduct or misrepresentation. This principle has become elementary, and has been recognized as such in several cases in this court. *Roe* v. *Jerome*, 18 Conn., 153; *Taylor* v. *Ely*, 25 id., 258.

Did the defendants keep silent when it was their duty to speak; did they, with knowledge that their credit was being fraudulently used with the plaintiff, neglect to notify him? And if they had spoken or acted when it was their duty to speak and act, could they have prevented the sale in question? I think it clear that an affirmative answer must be given to both questions.

The fact that the grain was shipped by railroad, directed to the defendants, is important but not alone conclusive. There is an explanation of that, and it was not a sufficient intimation to the defendants that the goods were purchased on their credit. The same is true of the payments by checks. But before the purchase of the parcel in question, the fact came to the knowledge of the defendants that *all the bills* for *all* the grain which Howe & Wickwire had purchased from the time when they commenced business had been made out against the defendants, and the bills were seen by them. To their inquiry what it meant they received no explanation. They

Winton *v.* Hart.

thereupon supposed it to be an inadvertence, and kept silence. But they had no right to make such a supposition, or to keep silent. Those bills were made out by wholesale dealers in a considerable business centre, presumptively according to mercantile practice, and they embraced all the dealings between the parties. If made according to the usual and well known course of business under our book debt system, they were *representative of charges on the books of the plaintiffs to the defendants*, for grain sold on *their credit*, and so, under the circumstances, the defendants should have understood them. Howe & Wickwire were irresponsible, and those bills alone, and certainly in connection with the other facts, plainly told the defendants that they were using the credit of the defendants. No business man (in the absence of clear explanation) could understand them otherwise, and as they covered the whole period during which Howe & Wickwire had been in business, no correct business man could attribute them to inadvertence. The defendants therefore, as merchants acquainted with the usages and customs of trade, *were informed by those bills* that their credit was being used, and were bound to speak. If they had spoken, the last parcel—that in question—would not have been purchased, or would have been stopped "*in transitu.*" In my judgment the defendants should be holden estopped, and a different decision would introduce a bad precedent into our commercial law.

For these reasons a new trial should be advised.

In this opinion the other judges concurred.