## PATTERSON v. HITCHCOCK.

1. In cases involving the title to real estate, the doctrine of estoppel by conduct rests upon the broad principle of equity, that one who encourages by representations, or even stands by and sanctions the acquisition of land by another, will be estopped to defeat the purchase by afterward asserting title in himself.

2. One cannot assign error upon an instruction in his own favor, even though the instruction is erroneous.

3. What is to be regarded as a reasonable time to occupy in sinking a discovery shaft in the manner and to the depth required by law is, when the facts are undisputed, a question of law. But when the question is submitted to the jury with the instruction that ninety days is not a reasonable time, he against whom the verdict is rendered cannot be heard to complain upon this ground, if the jury should determine that a less period than ninety days is a reasonable time.

4. The record of the certificate of location of a mining claim does not necessarily disclose the title.

5. If a located lode terminates at any point within the location, or departs at any point from the side lines, the *location* beyond such point, and to that extent, is defeasible if not void, before patent.

*Appeal from District Court of Boulder County.*

THE facts are stated in the opinion. The defendant in the court below had judgment.

Mr. W. A. HARDENBROOK, for appellant, and Mr. HUGH BUTLER, of counsel.

Messrs. BELFORD & REED, and Mr. W. R. GORSLINE, for appellee.

ELBERT, J. On the 16th day of August, 1875, the appellee made application at the United States land office for a patent for the "American lode."

Thereafter, and within the time limited by law, the appellant filed an adverse claim, as owner of the "Bull of the Woods" lode.

This was an action of ejectment brought by the appellant against the appellee to recover the possession of the ground embraced within the side lines of the two lodes at their intersection.

At the trial in the court below, a question of estoppel was presented, arising out of representations made by appellant pending negotiations for the purchase of the American mine by the appellee.

Touching the estoppel which the appellee sought to establish, the court instructed the jury as follows :

" If you believe, from the proof in the case, that the defendant, by his agent, Smith, applied to the plaintiff, Patterson, for the purpose of ascertaining whether the plaintiff claimed any interest in, or knew of any lode claimed by him that would conflict with the title of the American mine, and the plaintiff knew that the defendant contemplated purchasing the American mine, it was his duty then to assert his claim, if he had any, to any property the defendant was about to purchase ; and if the plaintiff had full knowledge of the matters inquired about and failed then to assert his claim, and the defendant, or his

agent, was influenced to purchase the American mine by what the plaintiff said at that time, he is estopped from asserting such claim against the defendant at this time. That is, he is concluded by his declaration or conduct, which has influenced the conduct of another to his prejudice. The rule being that when one by his words or conduct willfully causes another to believe the existence of a certain state of things, whereby he is induced to act on that belief, so as to alter his own previous position, such person is concluded from asserting against the other a different state of things as existing at the same time. There must be a representation or concealment of material facts. The representation must be made with knowledge of the facts. The party to whom made must be ignorant of the truth of the matter. It must be made with the intention that the party to whom made should act upon it. The other party must have been induced to act upon it."

The giving of this instruction is assigned for error.

In cases involving the title to real estate, the doctrine of estoppel by conduct rests upon the broad principle of equity, that one who encourages by representations, or even stands by and sanctions the acquisition of land by another, will be estopped to defeat the purchase by afterward asserting title in himself.

The *intent* of the doctrine is to restrain fraud, and compel good faith and fair dealing, and in this view it is to be rigidly enforced.

The *effect* of the doctrine is to withdraw title to realty from the operation of the statute of frauds, to leave it resting in parol, to preclude its assertion by evidence less conclusive, less certain, and more liable to the taint of human imperfections, than the written evidence required by the statute ; and, in this view, its enforcement should be carefully guarded, and unhesitatingly refused, except where all the elements of an estoppel are present.

The instruction complained of, so far as it gives the essential elements of an estoppel, follows the language of Mr.

Bigelow. Bigelow on Estop., p. 437. 1. There must have been a representation or concealment of *material* facts. 2. The representation must have been made with *knowledge* of the facts. 3. The party to whom it was made must have been *ignorant* of the truth of the matter. 4. It must have been made with the *intention* that the other party should act upon it. 5. The other party must have been *induced* to act upon it.

The second and fourth propositions must be accepted as qualified by the authorities. The second is true unless the party making the representations was bound to know the facts, or ignorance of them was the result of gross negli-gence. Bigelow on Estop., 476, and cases there cited.

The fourth is true with the qualification that gross and culpable negligence upon the part of the party sought to be estopped, the *effect* of which is to work a fraud on the party setting up the estoppel, supplies the place of intent. *Henshaw* v. *Bissell*, 18 Wall. 271 ; 3 Washb. on Real Prop. 80.

The omission, however, of these qualifications were in the appellant's favor, and he cannot be heard to complain of the instruction on this ground. If the evidence supplied, or tended to supply, these five essential elements of an es-toppel, the court was warranted in submitting the question to the jury, and the instruction given with the above mod-ifications, correctly stated the law.

Let us inquire if the evidence warranted the submission.

First, was there a representation or concealment of mate-rial facts ?

In the conversation had between Smith and Patterson, just prior to the purchase of the American mine by Hitch-cock, and pending the negotiation therefor, Smith testified, that he, acting as the agent of Hitchcock, inquired of Patterson, if he knew of any other claims that conflicted with the American. Patterson replied that he did not, ex-cept, possibly, the Inter-Ocean lode. This was a false repre-sentation, if the claim which Patterson *now* sets up had

*then* any existence. "At the same time" Smith testifies, "I remarked to him that his 'Bull of the Woods' claim crossed that (the American), but I understood that to be a subsequent location. I cannot give his reply to that, but I know he assented to it. He did not claim to me that there was any conflict between the American mine and the Bull of the Woods." Upon Smith's assertion that the Bull of the Woods claim was "a subsequent location," Patterson's failure to claim otherwise, if he did so claim, was a concealment of a material fact. Smith, however, testifies to an actual assent replied (though he does not remember the words of the reply), and this amounted to a representation as to a material fact.

Second. Was the representation made with knowledge of the facts ?

There is no claim, nor is there any foundation for saying that Patterson had not full knowledge of the questions to which he spoke. The facts inquired of rested peculiarly within his own knowledge. The presumption is, that every one is acquainted with his own rights, if he have reasonable opportunity to know them.

Third. Was the party, to whom the representations were made, *ignorant* of the *truth* of the matter ?

Upon this question there is more difficulty. The certificate of location of each lode was of record, and to these records both agent and principal had access equally with Patterson. The appellant insists that the case comes within the rule, that "where the condition of title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel." Undoubtedly this is the rule where the record discloses the title, as is the case generally, with patented lands. *Brant* v. *Virginia Coal & Iron Co.*, 3 Otto, 337. But the record of the certificate of location of a mining claim required by law does not necessarily disclose the title—nor did it in this case. The law prescribes that the certificate shall contain : 1st, the name of the lode ; 2d, the name of the locator ; 3d, the date of

location; 4th, the number of feet claimed on each side of the center of the discovery shaft; 5th, the general course of the lode, as near as may be. This, however, gives the purchaser no information respecting conflicting claims. For this he is dependent on examination and inquiry. If a conflicting claim be ascertained, the record still does not necessarily disclose the better title. Location and record still relate back to the date of discovery for the inception of title. Location and record may both be prior to those of a cross lode, and still the latter be the older and better title, by reason of an earlier discovery, perfected within the statutory time, of which the record gives no information.

In the case at bar, the date of the certificate of location of the American mine was June 16, 1874; of the record, June 29, 1874. The date of the certificate of location of the Bull of the Woods lode was July 11, 1874; of the record July 13, 1874. In the body of this certificate the location is stated as April 17th, 1874.

This record did not disclose any condition of title upon which Smith, as the agent of the purchaser, Hitchcock, could rely. It was for him still to inquire as to the date of discovery of the respective lodes, and as to whether the requirements of the statutes respecting discovery, discovery shafts, location and records had been complied with.

Having reference to the record, therefore, this was not a case where the condition of title was known to both parties, or where both had the same means of ascertaining the truth respecting it. To ascertain priority of right, as before stated, Smith was dependent on examination and inquiry. Under the circumstances, he properly applied to the appellant for information touching his cross lode, the Bull of the Woods.

If the priority of right, which the appellant claims, has any foundation *now*, it must have had existence *then*, and that too within the knowledge and intent of the appellant; and knowing that Smith was negotiating for the purchase of the

American lode, every principle of good faith and fair dealing required him to then make known his claim.

Fourth. As to the actual intent of the appellant, in making these representations, we need not inquire. If their effect was to work a fraud, it supplies the place of intent to defraud. Under the circumstances, he must have contemplated his representations would be relied upon. It was not to be expected that he would make a false admission adverse to his own interest.

Fifth. Was the other party *induced* to act upon the representations?

Smith testifies: "If he (Patterson) had said he had any claim there, I should not have paid the money until that was settled."

This is but a summary of the evidence on the points, but it is sufficient for our purpose; and we think there was sufficient to warrant the court in submitting the question of estoppel to the jury.

To every essential element of an estoppel, there was more or less evidence. Of the weight and conclusiveness of this evidence, the jury were the judges.

The instruction of the court by which it was submitted, as we have seen, was more favorable to the appellant than, under the law, he was entitled to ask.

We find here no ground for reversal.

It is claimed that the court erred in instructing the jury that "Ninety days was not a reasonable time to occupy in sinking a discovery shaft, in the manner and to the depth required by law." The instruction was as follows:

"The discoverer of a lode, by virtue of that discovery, becomes entitled to a reasonable length of time in which to perfect the work required by law; and for that time he is permitted to retain possession of the property without interference; and the law protects him in his possession, while the work of development goes on, as well as after the development is completed; but, in the meantime, his work must progress with reasonable diligence. The discovery of

the plaintiff's claim was made prior to the time the act of February 13, 1874, took effect, which was on the first day of June, 1874. That act provides that the discovery shaft shall be sunk within sixty days from the date of the discovery. The legislature seemed to consider sixty days a reasonable time for the discoverer of a lode to complete the work of sinking the shaft, and I instruct you that if the plaintiff discovered the Bull of the Woods lode on the 17th day of April, A. D. 1874, the law required that he should proceed to sink his discovery shaft with reasonable diligence and within a reasonable time; ninety days is not a reasonable time to occupy in sinking a discovery shaft, in the manner and to the depth required by law."

What is to be regarded as a reasonable time, when the facts are undisputed, is a question of law. *Wiggins et al.* v. *Buckham*, 10 Wall. 129; *Leaming* v. *Wise*, 73 Penn. 175; *Morgan* v. *McKee*, 77 id. 228; *Douse* v. *Wheeler*, 26 Mich. 195; *Nudd* v. *Wells*, 11 Wis. 417.

If the court erred at all in this case, it was in submitting the question of reasonableness of time to the jury. There was no dispute about the facts upon which it was to be determined. They were a part of the appellant's own showing. He fixed the date of his discovery on the 17th of April; the commencement of work on the discovery shaft, in the latter part of June; his witness Veale fixed it about the middle of June; the completion of the shaft was fixed by both as the 11th of July. The shaft was five feet wide, nine feet long, and ten feet deep; the time occupied in sinking it was, at most, twenty-five days; the time from the date of discovery to the completion of the shaft was eighty-five days; the time from the date of discovery to the commencement of work on the shaft was about sixty days. Upon these undisputed facts, the question, whether the appellant had completed his discovery shaft, within a reasonable time, was a question of law for the court.

Had the evidence shown, or tended to show, that the delay in sinking the shaft was the result of extraneous circum-

stances—such as personal disability, inaccessibility of the lode, obstructions by heavy snow or other impediments— then the question of reasonableness of time would have been for the jury, under the instructions of the court. But the evidence presented no features of this character, requiring the aid of a jury. Nevertheless, the court submitted the question to the jury, instructing them that ninety days was not a reasonable time. This limitation did not preclude the jury from finding that eighty-five days was a reasonable time, if such had been their opinion. The court having the undoubted right to determine the question, absolutely, the appellant cannot be heard to complain that it fixed a limit that permitted a finding in his favor by the jury.

The law contemplates that the discoverer of a lode shall prosecute the work of sinking his discovery shaft with, at least, ordinary diligence.

The time reasonable in which to do a given work, as a matter of law, must be referred, measurably, to the time necessary to do it as a matter of fact. Since, as a matter of fact, it took twenty-five days to sink this shaft, it is difficult to see why, as a matter of law, a reasonable time in which to do it would be eighty-five days. Such a period exceeds any possible time required by reason or necessity.

It appears in evidence that during this period the appellant did sink a cross-cut of about equal dimensions at another point on the lode; and had he sunk a third shaft of equal size, he would still have had ten days in which to have had a fourth well under way. Under all the circumstances, we think it was a matter of grace to the appellant that the court left the question to the jury under an instruction that did not preclude a finding in his favor.

The mistake of the court, in stating that the act of 1874 went into effect on the 1st instead of the 16th of June, was immaterial. The appellant's discovery was prior to either date, and whether the act went into effect on the 1st or the 16th was indifferent.

Error is assigned upon the refusal of the court to give the following instruction :

"It is essential to a mining claim that it should be made upon the line of a lode ; and it is, therefore, incumbent on the defendant, in making out his defense, to show that the vein of the American mine runs into or through the ground in controversy. If he has offered no testimony to show that the vein of the American lode enters, or passes across the territory of the Bull of the Woods location, and there are no other proofs in the case from which you can find that fact, the defendant must fail and the plaintiff would be entitled to a verdict."

Error is also assigned on the refusal of the court to admit evidence to show that the American lode did not cross the Bull of the Woods lode, although the location crossed it.

There was no error in refusing the instruction.

When a locator has shown a compliance with the requirements of the law in making his location, he is entitled *prima facie* to all the rights which the law attaches to a valid location.

The extent to which a location must be *on* a lode, in order to its validity *prima facie*, is fairly measured by the extent to which it is necessary to show it on the lode in order to entitle the locator to stake his boundaries, make his record, and, if he desires, perfect his title by patent.

The refusal of the court to allow the appellant to show that although the American location crossed the Bull of the Woods lode, the American vein or lode did not cross it, presents a more difficult question.

May a location *prima facie* valid be defeated in whole or in part by showing a termination or departure of the vein at some point within or along the side lines of the location ?

The evidence of Van Wettering respecting the underground workings, within the limits of the intersection of the two locations, did not connect the workings with the American lode, or show its actual presence ; much less did it

show that the American vein extended to or across the vein of the Bull of the Woods.

The question presented is, therefore, unembarrassed by any question of fact. Both locations are made under the act of 1872. It will be observed that the rights secured by section 3 of the act attach to locations made, in the language of this section, "*on* any mineral vein, lode or ledge." To arrive at the intention of the legislature we must consider the act as a whole ; accepting the broader or doubtful expressions of one section, as limited or explained by other sections. The term "*on* any mineral vein, lode or ledge," must be read in the light of the requirement of section 2 of the act. This section limits the location to 1,500 feet in length, "along the vein or lode," and declares that "no claim shall extend more than 300 feet on each side of the middle of the vein at the surface."

These provisions are plain and explicit, and require, not in express terms it is true, but by necessary implication, that the location should be on the lode the entire extent of the 1,500 feet. With a location off the lode, compliance with the law would be impossible in the matter of width, as the basis of measurement provided by the law would have no *existence*. By necessary implication, the work requisite to fix the course and position of the lode was also contemplated in order to enable the locator to embrace it within the lines of his location. These requirements interpret the expression, "on a vein or lode," as used in section 3 of the act. They afford undoubted evidence that this was the character of location to which it was intended that the rights conferred by the section should attach.

It is claimed, however, that a mislocation, however it may affect the miner's right to the lode located, will not affect his right to the surface ground, either in whole or in part; that under the act of 1872 the surface ground is not a dependent grant.

Under the act of 1866, "surface ground was allowed for the convenient working of the lode or vein, and for no other purpose."

Such is the language of Justice FIELD, in the case of *The Eureka Mining Co.* v. *The Richmond Mining Co.*, 4 Saw. 302. Under this act the right to surface ground was clearly dependent upon the right to the lode located. It failing, all incidents thereto attaching would also necessarily fail.

Although the act of 1872 enlarges the rights of the locator by a grant of " all veins, lodes and ledges, the top or apex of which lie within his surface lines," we are still of the opinion that his right to the surface ground continues dependent upon his right to the principal lode and that his right to other lodes within his surface limits is equally dependent.

This enlargement of the rights of the locator was doubtless intended to stimulate his enterprise by increasing his reward ; but the controlling reason was to prevent the controversies which were constantly arising respecting veins and lodes connected or associated with the lode claimed. These controversies obstructed the full and proper enjoyment of the principal lode granted, and the design was to settle and prevent them.

In this, and in the case of surface ground, it was intended to grant that which was associated with the principal lode, by proximity, within prescribed limits. When this association ceases, in the case of surface ground, the reason for granting it ceases.

A *mineral vein or lode* is a leading term in both acts. There must be a lode discovered and appropriated by compliance with the requisites of location. This is the prominent and pronounced subject of the grant. This was what the miner had discovered, and claimed by right of discovery. The security of his title thereto was the practical necessity with which the act dealt. All else, we think incident thereto : under the act of 1866, the right to the surface ground ; under the act of 1872, both the right to surface ground, and to other veins, lodes and ledges.

The principal lode constitutes the measure of the miner's right to the surface ground, as the surface ground when thus

determined, in turn, constitutes the measure of his right to other veins, lodes and ledges, subject to the express limitations of the law.

It follows, therefore, that if the lode located terminates at any point within the location, or departs at any point from the side lines, that the location beyond such point, and to that extent, is defeasible if not void.

Whether after the issuance of a patent, a judicial investigation may be had, which might ultimate in annulling so much of a mining location as was not made in accordance with the provisions of law, presents a different question, which we do not decide.

The court erred in rejecting the offer of evidence to show that the American lode did not cross that of the Bull of the Woods, within the limits of the ground in controversy.

Had the plaintiff been able upon the trial to show this fact, it is clear that the defendant could not have insisted upon the estoppel which he claimed, as there would be no subject-matter to which it could apply. It is equally clear that while the plaintiff's location might not have been good as against a prior location of the American mine, still his right to recover the premises, in the absence of any valid location by the defendant, would rest upon very different considerations.

Judgment is reversed and the case remanded for further proceedings according to law.

*Reversed.*