[No. 1163.]

## AYER ET AL. v. YOUNKER.

1. GAMING CONTRACT.

A promissory note the consideration for which is money or property won by gaming, or money or property loaned for the purpose of gaming, is utterly void and of no effect. And this is true although the instrument may be in the hands of an innocent purchaser for value.

2. SAME—ESTOPPEL.

Where the maker of a note, void because given for a gambling debt, consented that the payee might hypothecate the note as collateral security for borrowed money, and it was so hypothecated to an innocent party, but the innocent party knew nothing about the maker having consented to the hypothecation, the maker was not estopped from pleading the statute as a defense to the note. To constitute an estoppel, by conduct, the innocent party must have been misled by the conduct, or induced to act upon the representation or concealment. The innocent party not knowing that the maker had consented to the hypothecation could not have been misled thereby.

3. ESTOPPEL BY SILENCE.

The general rule is that one is estopped from alleging the truth, when his silence has been the inducement to action by another party, which would result in loss but for the estoppel. The true test is whether or not the circumstances are such as to impose upon one in equity and good conscience the duty to speak. If a person is present at the time of the transaction he must speak or he will be estopped. If absent, his silence or other conduct must, at least, be of a nature to have an obvious and direct tendency to cause the omission or step taken.

4. SAME—PUBLIC INTEREST.

In the application of the doctrine of equitable estoppel there is a distinction between cases in which the instrument sought to be avoided was one tainted with legal or moral turpitude and expressly declared by law to be "utterly void and of no effect," and one, which though voidable was free from such taint or legal prohibition. In the former case it requires stronger and more positive proof to sustain the plea of estoppel than in the latter. In the latter case the parties to the transaction are alone concerned, in the former the state or public has an interest. The statute declares the note in question to be "utterly void and of no effect" whether in the hands of an innocent purchaser for value or otherwise; not

from any regard for the defendant or his rights, but for the interests of the public. In the opinion of the lawmaking power the consideration was subversive of public morals and against public policy. Under the evidence defendant was not estopped from pleading the statute as a defense to the note.

5. GAMING CONTRACT—EVASION OF STATUTE.

The keeper of a gambling house cannot avoid the effect of the statute which makes all contracts based upon a consideration of money lost at gaming, or money borrowed for gaming purposes, by the pretense that " chips " only were sold or redeemed.

6. SAME.

The fact that checks were originally given for the gambling indebtedness, and afterwards were taken up and a note given in their stead, does not change the effect of the statute. The note was simply a substituted evidence of the same indebtedness, and based on the same consideration.

*Appeal from the District Court of Arapahoe County.*

Mr. CLAY B. WHITFORD, and Mr. H. A. LINDSLEY, for appellants.

Mr. S. E. BROWNE, for appellee.

WILSON, J., delivered the opinion of the court.

In 1892 and prior thereto, Hyde & Vedder were the proprietors of a gambling house in the city of Denver. Younker, defendant and appellee, was a frequenter of such place and at various times lost money to the proprietors at games of chance, and borrowed money from them for the purpose of gambling. For the sum so lost and borrowed, defendant gave his checks at various times. On December 21, 1892, a settlement was had between the parties, Hyde & Vedder surrendered defendant's checks and received from him in place thereof, two promissory notes, payable to themselves, each for the sum of $1,250, and due from one to two years after date. In April, 1893, Hyde & Vedder borrowed $320, from the plaintiffs, appellants in this case, gave their note therefor and, as collateral to secure this loan, assigned to

them the one year note of Younker. In September, 1893, the Hyde & Vedder note was renewed. When the Younker note became due, payment was demanded; and being refused, on March 22, 1894, plaintiffs commenced suit thereon. Defendant answered setting up the fact that the sole consideration of said note was a gambling consideration and claiming that it was therefore null and void. Plaintiff replied alleging the fact that they were innocent holders for value and setting up certain acts of defendant which they claim should estop him from maintaining such a plea. Trial was had to the court, and judgment was in favor of defendant from which plaintiffs appeal.

The evidence was sufficient to support the finding of the trial court that the consideration of the note came within the provision of sec. 850, Gen. Stats. This statute is very broad in its scope and unequivocal in its language. It has been in force in this state for many years and is similar in its character to statutes existing in nearly, if not entirely, all of the states in the union. By its terms all contracts, promises, agreements, conveyances, securities and notes made, given, granted, executed, drawn or entered into, where the whole or any part of the consideration thereof shall be for money or property won by gaming or money or property loaned for the purpose of gaming, " shall be utterly void and of no effect." And this is true although the instrument may be in the hands of an innocent purchaser for value.

" The language employed is open to no other construction. The protection which the law extends to an innocent holder, who, for value, in the usual course of trade, has received negotiable paper, is of no avail when the statute in terms or by unavoidable implication has pronounced the instrument absolutely void. Stricken with nullity at its birth, it can thereafter gain no validity." *Boughner v. Meyer*, 5 Colo. 73.

It appears from the evidence that at the time of the execution of the notes by defendant, Hyde & Vedder promised, that they would hold and not dispose of the notes, but upon their suggestion that they might wish to use them as collat-

eral to secure loans, defendant assented to this, cautioning them, however, not to put them up for too much. There was also some evidence to the effect, that prior to the time when Hyde & Vedder secured a loan from plaintiff they informed defendant that they expected to secure such a loan, putting up his note as collateral therefor, and that he made no objection thereto.

It is admitted that plaintiffs at the time of their loan to Hyde & Vedder, knew nothing of defendant's consent that his note might be assigned as collateral, and that neither Hyde nor Vedder said anything to them about it and it does not appear from the evidence that at such time plaintiffs had any knowledge of any fact affecting the validity of the note.

Upon this statement of facts plaintiffs invoke the doctrine of estoppel and claim, that defendant having consented to the transfer of his note to an innocent purchaser for value, cannot now be heard to assert that it is invalid. This principle rests upon the broad ground that a party shall not be permitted to take advantage of his own wrong, that, if by his misrepresentations or concealment of a material fact or silence when he should speak, he induces another party to act, he shall not thereafter be allowed to assert a different state of things from that which he induced the other to believe existed. The intent is to restrain fraud and compel good faith and fair dealing.

In order to constitute an estoppel by conduct, however, certain elements are essential and necessary. These have been clearly expressed and well settled by the law writers and by the highest judicial authority in the state. *Patterson v. Hitchcock*, 3 Colo. 536; *Griffith v. Wright*, 6 Colo. 250; Bigelow, Estoppel, p. 570; 2 Herman, Estoppel, § 1115; 2 Pomeroy, Eq. Jr. § 805.

Of these essential requirements the only one necessary to be considered in this case is that the innocent party must have been induced to act upon the representation or concealment. That this condition must exist, all the authorities agree, for the reason, that, if it did not, then the party was

not misled. It was said by this court in *Colo. Fuel & Iron Co. v. Lenhart*, 6 Colo. App. 516 : " But conduct alone does not create an estoppel. If no rights have been affected by the conduct, there is no one in whose behalf the doctrine of estoppel can be invoked. To create the estoppel some other person must have changed his position on the faith of the conduct. The foundation upon which the doctrine rests is that it would be a fraud for one, who by his conduct, has induced others to accept something as a fact, to deny that such was the fact, after they had acted upon their belief. But there can be no estoppel in favor of one who has not been misled." The same doctrine was also enunciated in *The Colo. Loan & Trust Co. v. Grand Valley Canal Co.*, 3 Colo. App. 73. The plaintiffs in this case expressly aver in their replication that they had no knowledge of the defendant's consent to the hypothecation of his note until after the institution of this suit. It follows therefore that they were not influenced in the making of the loan to Hyde & Vedder by any statements made to them by defendant. The doctrine of equitable estoppel cannot then be invoked on this ground. It may be urged, however, that defendant is estopped to deny his liability on the note by reason of his silence, when informed by Hyde & Vedder, that they intended to put it up with plaintiffs as collateral to secure a loan, and of his failure then to notify plaintiffs of its invalidity. The general rule is that one is estopped from alleging the truth, when his silence has been the inducement to action by another party, which would result in loss but for the estoppel. 2 Herman, Estoppel, § 995.

There are many instances however, in which an estoppel does not arise from silence. The true test is whether or not the circumstances are such as to impose upon one in equity and good conscience the duty to speak. As to when this duty devolves there is not and, from the nature of the case cannot be any established or uniform rules. It depends, to a great extent, upon the circumstances attending each particular case and it is rare that two are alike. Generally

speaking if a person is present at the time of the transaction he must speak, or he will be estopped.   If absent, his silence or other conduct must, at least, be of a nature to have an obvious and direct tendency to cause the omission or the step taken.   Bigelow, Estoppel, p. 596.

Again there are cases wherein it would be incumbent upon a person, being informed that a transaction was about to take place, to seek out the innocent party and speak. For instance the accommodation maker of a negotiable note would be estopped to plead want of consideration, as against the assignee, if it were shown that he had previous knowledge that it was to be negotiated and to whom, and had failed to notify the assignee prior to the transfer.

In the application of the doctrine of equitable estoppel, we think there is very clearly a distinction between the cases in which the act or instrument sought to be avoided was one tainted with legal or moral turpitude and expressly declared by law to be "utterly void and of no effect," and one which, though voidable, was free from such taint or legal prohibition.   In the former case it should certainly require stronger and more positive evidence to sustain a plea of estoppel than in the latter.   In the latter case the party urging the plea is solely concerned, in the former, the state or public has an interest.   Surely it cannot be claimed that the plain provisions of a public statute should be disregarded, set aside and nullified unless the facts, relied upon to take the act or thing in question without its inhibition should most clearly appear.

In the case at bar, defendant executed a negotiable promissory note, perfect upon its face and with nothing in its contents to indicate in the slightest degree any taint of illegality or invalidity.   He said thereby that he was legally bound to pay the sum of money specified, to whomsoever should be the lawful holder of the note at its maturity, without any offset or claim of defense.   At the instant, however, of the execution of the note the statute applied and declared it to be " utterly void and of no effect," whether in the

hands of an innocent purchaser for value or otherwise. This it did not do from any regard for the defendant or his rights but for the interests of the public. The consideration was, in the opinion of the lawmaking power, subversive of public morals and against public policy.

Holding these views we do not think that the evidence as to the representations or conduct of defendant, discloses facts sufficient to estop him to plead the statute as a defense to this action. It does not appear that plaintiffs had any knowledge of his representations, and hence they were not misled by them nor were they acted upon at all. No statements of defendant, whether expressed verbally or implied from his silence, could have added to the force and effect of those, solemnly set forth in the note in writing. If he had been present and remained silent when the transfer of the note took place, or if plaintiffs had been informed prior to the time when they took the note, that defendant had been notified of the intended transfer and had consented thereto or acquiesced by his silence, then a different case might be presented—one from which the court might presume a new promise free from the taint of the statute. To hold that an estoppel would arise under the circumstances of this case as shown by the evidence would be to establish a rule, by which, it can be readily seen, the operation of the statute could be easily defeated in all cases. The only representations of defendant relied upon, whether express or implied, were made to the payee of the note, the beneficiaries of the gambling transaction and were never communicated to or acted upon by the plaintiffs. Under this view of the law, as applied to the facts of this case, we do not think that the authorities cited by counsel for appellants are in point. They are in cases arising upon accommodation paper, executed expressly for the purpose of enabling the payee to secure a loan, or where the representations relied upon, were made by the obligor directly to the assignee, or were communicated to him under such circumstances as to create the reasonable inference at least that they were acted upon.

The argument of counsel, that the consideration of the note was not affected with gaming, and hence not within the statute, is ingenious but not sound. The claim that the keeper of a gambling house may avoid the statute by a pretense, that "chips" only were redeemed or sold, cannot be entertained. It is too palpable and bald an attempt at evasion. The trial judge, before whom the witnesses testified in person, found that the note had a gambling consideration and in fact the plaintiffs do not appear to have seriously contested this. Under the usual rule, this alone would be sufficient for this court to sustain this finding, but an inspection of the record shows that there was ample evidence to support it.

In reference to the plea of estoppel by recital, based upon the fact that the note itself recites a valid consideration— "for value received"—it is only necessary to say that the statute, in plain and unmistakable terms declares such notes, if in fact affected with a gaming consideration, to be "utterly void and of no effect."

Neither can it be successfully maintained that because checks were originally given for the gambling indebtedness, and thereafter these were taken up, and the note in suit given therefor, a new promise arose, whose consideration was free from taint attaching to that of the checks. The note was simply a substituted security for, or evidence of the same indebtedness, and partakes of the same infirmity and is open to the same defense as were the checks. *Chapman v. Black,* 2 B. & A. 591; *Cutler v. Welsh,* 43 N. H. 498; *Holden v. Crosgrove,* 12 Gray, 217.

The transaction was between the same parties and no additional consideration appears.

Counsel urge with great vigor and force that if this judgment be permitted to stand plaintiffs would suffer serious loss and injury without any fault or negligence on their part. The enforcement of the statute invalidating gaming contracts, and evidences of indebtedness, whose consideration was a gambling debt, declaring them to be, not voida-

ble at the election of the maker, but utterly void, must, necessarily, in some instances entail hardship. Especially is this true when it destroys the validity of negotiable paper, which, according to commercial law and usage, should be unassailable, and declares that the innocence of an assignee for value shall not avail as a defense. It has been upon our statute books however, for thirty years, and it is to be presumed that the legislature, which enacted it, as well as each succeeding legislature, voicing the sentiments of the people whose representatives they were, considered that the harshness of the measure was justified by the object sought to be attained; the suppression of the vice at which it was aimed. Be this however, as it may, the duty of the courts is plain. The statute not being obnoxious to the constitution, being unequivocal in its terms, and susceptible of but one construction, they must uphold and enforce it. Their duty begins and ends there. They may be reluctant to obey the statutory command, as our supreme court has well said in *Bank v. McClelland*, 9 Colo. 611; especially in cases, where it is apparent, a hardship is inflicted upon an innocent party. This reluctance must not be carried, however, to the extent of deliberate evasion or violation of the plain letter of the law, however much the facts of isolated cases may appeal to their sentiments. An attempt by them to mold and bend the statute to suit individual cases according to their personal views of right and propriety would soon bring both courts and law into deserved disrepute and immeasurably greater evils would result.

The judgment will be affirmed.

*Affirmed.*


THOMSON, P. J., dissenting.

I find myself unable to accept the conclusion reached in this case by a majority of the court. I agree with them that the evidence showed that the consideration of the note in suit was a gambling debt; and I also agree that such a note is

absolutely void, even in the hands of an innocent purchaser for value, before maturity. But to my mind the decision of this case does not turn upon any question affecting the validity of the note. The question is, whether, to the extent of the money borrowed upon it, the defendant can be heard to say that it is void. The evidence was that when the note was executed it was agreed between Hyde & Vedder and the defendant, that they should not let it go out of their hands until it was taken up by him, subject to an understanding that they might use it as collateral security, provided they did not "put it up for too much." Hyde & Vedder kept the note in their possession for some months, when, being in need of some money, they found they could obtain it from the plaintiffs as a loan, securing it by the note of the defendant. Before pledging the note they informed the defendant of what they desired to do, and he assented. The principal opinion states the evidence concerning this part of the transaction somewhat mildly. It says that when the defendant was informed that Hyde & Vedder expected to use his note as collateral for the loan, he made no objection. The evidence was that before obtaining the money they informed him that they could use the note with the plaintiffs as collateral security for a loan, and asked his permission to do so, which he gave, cautioning them not to use it for too much. Acting upon this permission, Hyde & Vedder borrowed $320 from the plaintiffs, pledging the defendant's note, which was for $1,250, as security. The note was a negotiable promissory note, and had not matured. On its face it appeared to be legitimate commercial paper. The plaintiffs had no knowledge of any fact or circumstance which might affect its validity, or of any fact which would suggest inquiry, and did not know that the defendant had specially authorized its hypothecation. Upon these facts was the defendant estopped from setting up the invalidity of the note, to the extent of Hyde & Vedder's indebtedness to the plaintiff?

The learned author of the opinion has adopted some defi-

nitions of the doctrine of estoppel formulated in adjudicated cases; and, being unable to make the facts of this case come within the formulas he has found, he concludes that the defendant was not estopped to avail himself of the concealed vice with which the note was originally tainted. It is not always safe to take a statement of a general principle, which is found in the decision of a particular case, as an infallible guide in another case, although of the same general nature, where the facts and circumstances are not the same. Such statements usually take their form from the facts to which they are to be applied; and hence, while they may be within the principle, they are not, and do not purport to be, of universal application. Where special conditions of fact are under consideration, they necessarily give direction to the definition; and for that reason a complete statement of the doctrine is not to be expected in any single case. The definitions vary in their phraseology as the facts vary; although each, as a partial statement, may be correct, as being comprehended within the same general and fundamental principle. Speaking upon the subject of definitions of the doctrine of estoppel, essayed by courts, the supreme court of New Hampshire, in *Horn v. Cole*, 51 N. H. 287, said:

"In the much and well considered case of *Preston v. Mann*, 25 Conn. 118, 128, Storrs, J., delivering the opinion of the court says, 'The doctrine of estoppel *in pais*, notwithstanding the great number of cases which have turned upon it and are reported in the books, cannot be said even yet to rest upon any determinate legal test which will reconcile the decisions, or will embrace all transactions to which the general principles of equitable necessity wherein it originated demand that it should be applied. In fact, it is because it is so peculiarly a doctrine of practical equity, that its technical application is so difficult, and its reduction to the form of abstract formulas is still unaccomplished.' This was said in 1856, and little has since been done towards extricating the doctrine from the confusion and conflict of authority with which it was then embarrassed. This, I think, has been

caused by the fact that courts have continued to exercise their ingenuity in the vain attempt to compress a broad doctrine of equity within the narrow limits of a technical definition."

The theory of the opinion in the case at bar seems to be, that because the defendant made no direct representations to the plaintiffs by which they were misled, and because their investment in the note was not immediately influenced by his conduct or speech, therefore there can be no estoppel in their favor. Something like this has been said by courts; but it was said in cases where the estoppel claimed depended upon direct representation or immediate influence, and therefore amounted only to a statement of the law to be applied to the facts under consideration. It was never intended as a formula which would embrace every possible variety of transaction. I think it may be stated broadly, as a principle underlying all technical definitions of the doctrine, that if one by his declarations, or conduct, or silence, is willfully, or negligently, instrumental in causing another to change his position disadvantageously, he assumes a responsibility, which, as against that other, he will not be permitted to gainsay; and it is immaterial what the method may be by which the result is accomplished.

"In *Winter v. Hart.* 39 Conn. 16, a firm doing business in Goshen, by representing to the plaintiff, a wholesale dealer in Bridgeport, that the defendants were interested with them in their business, purchased goods from time to time on the defendants' credit. The bills were made out to the defendants, and mailed to the firm, by whom they were paid. This was all done without the knowledge of the defendants, who as a matter of fact were not interested with the firm at all. Before the last purchase, the defendants accidentally saw the previous bills, but supposed they were the result of a mistake, arising from inadvertence. The bill for the last purchase was not paid by the firm; and the defendants were held for the amount, because, having seen bills from which it appeared that their credit was being used, they neglected

to notify the plaintiff that the dealing was unauthorized. In *Mitchell v. Reed*, 9 Cal. 204, a party was held estopped by declarations to third persons which had been repeated to another who had acted on them, although it did not appear that the declarations were intended to mislead that other, or were made with any knowledge that the other could be in any manner affected by them. In *Quirk v. Thomas*, 6 Mich. 120, Christiancy, J., said: "Nor is there any principle which confines the rule of equitable estoppel to such representations as are made directly, and in person, to the parties acting upon them. Whether direct or indirect, in the presence or in the absence of the parties, is immaterial, so that they are calculated and intended to produce, and do produce the end."

The defendant did not say to the plaintiffs that the note was good, nor did he stand by in silence while it was being transferred to them; so that in paying their money on the note they were not directly influenced by either his words or his conduct. But he gave Hyde & Vedder authority to take the note to the plaintiffs, and pledge it with them as something of value. Hyde & Vedder kept the note in their possession in accordance with their agreement, until the transaction with the plaintiffs. When they found that the plaintiffs were willing to advance them money upon the note, they applied to the defendant for permission to use it, naming the parties from whom they proposed to obtain the money; and, with full knowledge that those parties, in parting with their money, would rely on the validity and collectibility of the note, he authorized its use as security for the loan. It is needless to speculate upon what his liability would have been, if he had merely ascertained that the plaintiffs were about to advance money on the faith of his paper, and had neglected to notify them that it was worthless. His attitude towards the negotiation of the note was not negative or passive. The transaction by which the money was obtained, was the result of direct authority given by him for that special purpose. While the plaintiffs did not know that he had given the authority, and were therefore, not

immediately influenced by it, yet it was given for the purpose of enabling Hyde & Vedder to obtain their money; and if it had not been given, so far as we can see, the loan would not have been made upon that note, because Hyde & Vedder would not have undertaken to use it. The paper, on its face, was valid. The vice with which it was infected was invisible; and, with full knowledge of what he was doing, he was actively instrumental in causing the plaintiffs to part with their money in reliance upon the deceitful appearance of the note. The act of Hyde & Vedder in pledging the note, was, in itself, a representation of its validity; the representation was made by the authority of the defendant; it was therefore his own representation; and it is immaterial that the plaintiffs were ignorant, at the time, of the part he had taken in the transaction. After being the cause of the plaintiffs investing their money in his paper, to permit him to say, as against them, that its consideration was illegal, would be to assist him in the consummation of a fraud. I think that equity, good conscience, and every rule of fair dealing, loudly demand that, as to the money loaned by the plaintiffs, his plea that the note is void should go unheard.

The note being void originally, its transfer to the plaintiffs did not impart vitality to it; but I think that in so far as may be necessary to protect them from loss, and no further, the defendant should be adjudged estopped to deny its validity; and that they are entitled to judgment against him for the amount loaned with legal interest. It is my opinion that the judgment ought to be reversed.