## AUGUSTUS S. CHASE AND OTHERS' APPEAL FROM PROBATE.

New Haven Co., Dec. T., 1888. PARK, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, JS.

A manufacturing corporation being financially embarrassed, its stockholders applied to F, a man of means and business experience, to take, in consideration of a large amount of the stock to be transferred to him, the management of the business, securing the outstanding notes of the company by his personal indorsement. F, for the purpose of ascertaining the amount of the company debts with reference to his action, applied to the different creditors for a statement of their claims, and among others to the S. & L. Bank, whose president stated its claim to be $17,000, which agreed with a statement previously furnished him by the company. The bank had at the time notes amounting to $29,900, made by the president of the company in his own name and secured by certain collaterals, which notes had been protested. The president of the bank knew of these notes, but did not regard the company as liable upon them, and acted in good faith in the matter. F decided to undertake the management of the business of the company and procured an extension of all its liabilities upon his endorsement of the paper. The company however did not succeed and finally went into insolvency. The bank then presented the $29,900 claim against its estate, and the claim, after a trial, was allowed. F had known nothing of it until shortly before the company failed, and the discovery of the claim was a reason for the company's going into insolvency. The estate was able to pay but a small dividend. The liabilities assumed by F for the company were about $200,000. He brought a petition to the court of probate asking for a decree that the claim of the bank for the $29,900 should be postponed to his own claim. The probate court denied the petition, and the case was carried by appeal to the Superior Court. Held—

1. That the bank was equitably estopped, as against *F*, from presenting that part of its claim against the estate of the company.
2. That the probate court had power to enforce this equity in its order for the payment of the dividends upon the claims allowed.
3. That as the bank was entitled to a full dividend on this claim as against all the other creditors, the dividend was to be reckoned on a total indebtedness.including this claim, and then *F* was to receive whatever additional dividend his claim would have received if this claim had not been included, the amount so added to *F*'s dividend being taken from the bank's dividend on this claim; the equity between *F* and the bank being thus settled without disturbing the dividends on the other claims allowed.

Where a person makes a representation to another with knowledge that the latter will act upon it and with intent that he should do so, and the latter acts upon it and is subjected thereby to loss, it is not enough that the person making the representation believed it to be true, if in due discharge of his duty he ought to have known or to have ascertained the fact.

[Argued February 1st—decided April 5th, 1889.]

APPEAL from a decree of a probate court denying the petition of the appellants for such a marshaling of the claims allowed against the insolvent estate of Brown & Brothers, a corporation, as should give the claim of Franklin Farrel, one of the appellants, a precedence in the payment of the dividend on the estate over a certain claim of the National Shoe & Leather Bank, another creditor: the appeal was taken to the Superior Court in New Haven County. The appellants (original petitioners to the probate court) were Augustus S. Chase and Edward C. Lewis, trustees of the assigned estate of Brown & Brothers, and Farrel before named, a creditor. The matters averred in the petition and in the answer of the bank, sufficiently appear in the finding of facts and in the opinion of this court. The Superior Court made the following finding of facts.

About the year 1883 the corporation of Brown & Brothers, located at Waterbury, Conn., which had for about thirty years carried on a large and prosperous business, became financially embarrassed. Its real estate and machinery prior to that time had always been placed in its inventory and its annual statements at a valuation of $75,000. For the purpose of increasing the statement of the amount of its assets,

and of procuring for the company credit; the president, Wm. H. Brown, and the bookkeeper, Mr. Clowes, in the winter of 1884, agreed to put the real estate and machinery in the inventory and annual statement at a valuation of $350,000, and it was so done. It did not appear that any appraisal of the real value of the property was made at the time by any other persons. Soon after this the president made a mortgage upon the real estate and machinery for the sum of $125,000. The embarrassments continued, and became so great that early in May, 1884, the president resigned, and the company substantially suspended business. Meetings of the stockholders were held, and efforts were made to secure some one to take the management of the com-pany and raise or provide money to carry on its business. A committee of the stockholders applied to Franklin Farrel, who was a man of recognized financial credit and large means, to take the management of the company under his exclusive control, giving it the aid of his resources, credit and business ability. He at first declined, but negotiations continued through the summer until August, and resulted in the following contract between the stockholders of Brown & Brothers, and Farrel, made on the 24th of August, 1883.

" Whereas, the corporation of Brown & Brothers of Water-bury, Conn., and sundry of the stockholders of said corpora-tion, have caused and secured to be transferred to Franklin Farrel of Ansonia, Conn., the amount of one hundred thou-sand dollars (being four thousand shares) of stock in said corporation, for a certain consideration hereinafter men-tioned; and whereas sundry of said stockholders have con-tributed from their stock *pro rata* to make up said amount to said Farrel, and it is believed that said corporation has a lien upon sundry shares of stock by virtue of sundry indebt-edness to said corporation:—Now, therefore, I, the said Franklin Farrel, in consideration of the transfer to me of $100,000 of stock in said corporation, do hereby promise and agree to and with said corporation, and with the said stock-holders therein who have contributed *pro rata* to make up the amount so transferred to me of $100,000 of stock, that

any and all stock hereafter acquired or secured by said corporation after making up said amount to said Farrel, by virtue of any liens in favor of said corporation now existing upon any stock or against any stockholders, shall belong to and inure to the benefit of said stockholders who have so contributed *pro rata* according to their respective amounts of stock, and shall not be claimed on my part as belonging to the whole corporation, and no interest therein shall be claimed by me. And I further agree, for the consideration aforesaid, to loan and advance to said company, at six per cent interest, such sum or sums of money as may be necessary to provide for the payment of the present existing indebtedness of said company, except such indebtedness as may be assumed by me, or otherwise provided for in such manner as may be convenient for me, but in such way as shall relieve said company from claims thereon; and also to loan and advance such other sums of money as may be necessary to place said company upon a safe and reliable basis for the continuance of its business, and to provide stock, supplies and means for carrying on the same, and to make necessary repairs and improvements in the mills and machinery of said company, and to provide for the continuance of its business; which sums of money so loaned and advanced to said company shall not be withdrawn or repaid to him until the existing indebtedness now being against said company shall be paid or provided for or assumed by said Farrel, and said company relieved from liability thereon ; but the interest on all sums so loaned or advanced by said Farrel shall be payable to him annually. And it is further understood and agreed by said corporation and said Farrel for the considerations aforesaid, that no dividends shall be paid to the stockholders of said corporation until the indebtedness of said corporation shall be reduced to a sum not exceeding one hundred thousand dollars. Waterbury, August 23d, 1884.

"FRANKLIN FARREL."

During the progress of the negotiations with Farrel, statements of the assets and a list of the liabilities of the company were made out at the meetings of the stockholders.

The debt to the Shoe & Leather Bank was put in these lists at $17,300. The real estate and machinery were put in at $350,000. With this valuation the statements showed an excess of about $223,000 of assets over liabilities, inclusive of the capital stock. The statements were shown to Farrel.

Before completing the arrangement Farrel undertook to ascertain for himself the actual amount of the assets and liabilities, and through his agent verified the accuracy of such inventory by actual count and weighing of the manufactured stock on hand, except the stock of german-silver goods, of which there was a considerable quantity, with which his agent was not familiar, and he took the statement of the officers or clerks of the company as to the value of that part of the assets.

For the purpose of ascertaining the amount of the liabilities, and whether an extension could be obtained thereon with his indorsement, Farrel visited the different banks which held the bulk of the obligations of Brown & Brothers. He went to the Shoe & Leather Bank and asked Mr. Crane, the president of the bank, what the amount of the indebtedness of Brown & Brothers was to the bank, and whether the bank would extend them for one year upon his indorsement. Mr. Crane asked the discount clerk for the exact amount of Brown & Brothers' notes, and gave the amount of the notes to Farrel as $17,300, and agreed to give the extension requested. Farrel then visited all the other banks holding Brown & Brothers' paper, and found that the indebtedness of the company to those banks corresponded in amount with the list of the indebtedness given him by the company, and that he could procure a like extension from them all. After he had ascertained these facts he decided to take the management of the company, and secure or indorse its liabilities, and to enter into the agreement before stated.

At the time of Farrel's interview with the president of the Shoe & Leather Bank, the bank, in addition to the notes of Brown & Brothers for $17,300, which were unsecured, held three notes of Wm. H. Brown, indorsed " Wm. H.

Brown, agent," and secured by six hundred and ninety-six shares of the Norwalk Lock Co. stock, and six hundred and thirteen shares of Brown & Brothers, said notes being for $15,000, $12,500, and $2,400 respectively. Mr. Crane made no mention of these notes to Farrel. At the time of the interview Crane believed these notes to be fully secured by the personal collaterals of Wm. H. Brown, and did not consider them to be obligations of Brown & Brothers, and the liability of the corporation on the notes did not become apparent to him until afterwards. I find that it was upon the understanding and belief by Farrel that the indebtedness of the company did not exceed the amount that had been so represented to him, and that the claim of the bank against the company did not exceed the amount of $17,300, that Farrel was induced to, and did, enter into the arrangement with the company, and make the contract mentioned. The amount of the indebtedness was a material question with him in deciding upon and afterwards making the contract with the stockholders, and he would not have made it if he had known or been informed that the bank held another claim of $29,900 against the company by reason of the notes given by Wm. H. Brown for that amount. The bank had full knowledge that Farrel was inquiring into the amount of the indebtedness for the purpose of deciding whether he would take the management of the company, and that he decided to do so with the belief and understanding that the claims of the bank against the company did not exceed $17,300. I also find that Mr. Crane acted in good faith in his statement to Farrel.

In carrying out the contract the bank transferred to Farrel its proportion of the stock of Brown & Brothers held by it. There has been transferred to him in all two thousand nine hundred and fifty-five shares of stock, one thousand shares of the stock of Wm. H. Brown being subject to an attachment and never transferred. I find however that Farrel accepted the stock thus transferred, and assumed the management and control of the company without objection.

Farrel became president and assumed control and man-

agement of the corporation August 25th, 1884, and indorsed the $17,300 notes held by the bank. The first extension was for one year, $15,000 of the same was then renewed for four months, the balance being paid. At the end of that time when Farrel sought a further extension, he was for the first time informed that a claim was made by the bank that the company was liable for the notes of $29,900. All the notes of $17,300 against the company, and also the notes for $29,900, had been protested, and were overdue and lying in the bank as protested paper at the time of Farrel's first interview with the bank officers in August, 1884. It was for the interest of the bank that Farrel should take the management of the company and indorse or secure the $17,300 held by the bank as protested paper of the company, as the debts of the company were in excess of their assets, aside from their mortgaged real estate and machinery; and there could nothing have been realized from the equity in the mortgaged property.

After assuming control of the corporation, Farrel, in addition to indorsing the notes of the Shoe & Leather Bank as above stated, indorsed the notes of the company held by all the other banks. He also borrowed $35,000 upon a note of the company, secured by his indorsement and collateral stocks of his own, which was presented to the commissioners, and allowed by them, but Farrel has paid the same in full. This money was used in paying current bills and starting work in the factory. He has also paid a large amount of other indebtedness of the company, and is held as indorser upon the remaining bank notes of the company, so that what he has paid and what he is liable to pay will amount to about $200,000. I do not find however that Farrel advanced to the company any money of his own, except in small sums, repaid to him, or paid out of his own means any indebtedness of the company, until after the assignment. The only proof of debt filed by Farrel with the commissioners was a claim for $20,294.45, which was made up of three notes and interest thereon, one of $8,000, one of $3,500, paid by him January 22d, and April 2d, 1886, respectively, and a third

note of $5,000 to Ruth E. Farrel, which latter represented a claim of said Ruth against Brown & Brothers which belonged to Farrel. The claim thus presented was allowed by the commissioners.

The business continued under the management of Farrel for about a year and four months, when it was found that the company was insolvent and that the capital stock could not be made of any value. Farrel undertook to settle up the business by paying or assuming all the claims against the company in full, whether secured or not, and disposing of the property to the best advantage. At this time the bank made the first claim to him that the company was liable for the three notes of $29,900, and soon after brought suit upon the same. And in consequence of that claim and suit the company made their assignment in insolvency.

The claim of the bank for the $29,900 was disallowed by the commissioners, and an appeal was taken by the bank from the disallowance. The Superior Court allowed the claim and the Supreme Court affirmed that judgment. The case is reported in 55 Conn., 469. A statement of the facts of that case will there be found, and will throw some further light upon the questions involved in the present case.

There had been large losses in the business after Farrel assumed the management, and there had been little or no profits. A considerable portion of this loss is accounted for by the disposition of the silver goods and business at a sum more than $30,000 less than they were inventoried for, and a fall in the price of copper. I do not find that the losses to the company were caused by the fault, neglect or mismanagement of Farrel or his agents. And I find the allegations of the defendant in the last half of the third paragraph and in the fourth paragraph of its answer untrue.

The corporation is hopelessly insolvent, much more so than in August, 1884, and only a small dividend will be paid out of its assets to its creditors. The claims upon paper indorsed by Farrel were presented to the commissioners by the various banks which held them, and were so allowed, but before the bringing of the petition to the pro-

bate court by the trustees and Farrel he had paid or assumed all these claims, except that of $29,900 allowed to the Shoe & Leather Bank, and was entitled to the dividend upon them.

Upon these facts the case was reserved for the advice of this court.

*C. R. Ingersoll* and *S. W. Kellogg*, for the appellants.

1. The court of probate has the power to pass the order marshaling the assets, and directing upon what claims the dividends should be paid. There can be no question as to this power. And the court in this case not only had the power, but it was its duty to pass the order prayed for, under the facts of the case. The statute, as it now exists, directs that the payment of dividends upon claims allowed against an insolvent estate shall be "subject to such existing equities as may be ascertained and decreed by the court." General Statutes, § 532. This statute was simply an affirmance of the common law of this state as to the power of courts of probate. This court had settled that doctrine long before. In *Hotchkiss* v. *Beach*, 10 Conn., 232, it was decided that the commissioners had sole jurisdiction under the statute of the allowance or disallowance of claims against the estate. In that case it was admitted by CHURCH, J., in the opinion, that the judge of probate had power to marshal the assets of the deceased. In *Waterman's Appeal from Probate*, 26 Conn., 96, which was an appeal from the action of the commissioners by the trustee of an insolvent estate, the court said that "the question of priority among creditors must be raised, if anywhere, in the court of probate, when the order for the distribution of the effects shall be obtained." The court of probate afterwards passed an order marshaling the assets of the estate, and providing that a certain class of claims should be paid in full, to the exclusion of any dividends upon another class of claims until the former should be paid; precisely such an order as is prayed for in this case. From that order the creditors whose claims were excluded appealed; and this court con-

firmed the order, and asserted the power of courts of probate to discriminate between claims in the payment of dividends, by a unanimous decision. *Ashmead's Appeal from Probate*, 27 Conn., 241. This doctrine was affirmed in *Vail's Appeal from Probate*, 37 Conn., 185, and is the settled law of the state, aside from the statute.

2. Courts of probate have equity powers, ample in all cases to do justice between all parties having interests in estates pending in settlement before them. The equities of course must be directly involved in the matters or estates of which the court has jurisdiction. There can be no question that an order for the payment of dividends to creditors is a matter directly involved in the settlement of an estate. This has long been settled law in this state. In *Bailey* v. *Strong*, 8 Conn., 278, 281, this court in speaking of probate courts says:—" These courts are vested with chancery powers on all subjects within their jurisdiction, and can so mould and form their decrees as to do entire justice between all parties in interest." In *Beach* v. *Norton*, 9 Conn., 198, the court says:—" These courts have all the powers of a court of chancery, and in some respects much greater, in relation to the trial of questions within their jurisdiction." This principle has been recognized as settled law by a long series of decisions in this state. *American Bible Society* v. *Wetmore*, 17 Conn., 187; *Ashmead's Appeal from Probate*, 27 id., 241; *Mix's Appeal from Probate*, 35 id., 123; *Vail's Appeal from Probate*, 37 id., 185; *Hewitt's Appeal from Probate*, 53 id., 24.

3. The bank cannot claim that it had no knowledge that this debt of $29,900 was a liability against Brown & Brothers at the time of Crane's interview with Farrel. It is estopped from this claim by the finding in the Shoe & Leather Bank's appeal. The parties in that case were the same as in this. The bank was the party on one side, the trustees representing the body of the creditors and the estate on the other. Farrel was a party to that case by representation; he had a right to appear and be heard in the case, and he did in fact appear. 1 Greenl. Ev., § 523; *Chapin* v.

*Curtis*, 23 Conn., 388 ; *Munson* v. *Munson*, 30 id., 433. No pleadings are necessary to make the other creditors parties in an appeal from commissioners; they are represented by the trustees, and are privies by representation. *Tolles's Appeal from Comrs.*, 54 Conn., 521. But whether the bank is bound by the finding in that case or not, it makes no difference in this case; for the bank, and Crane, its president, ought to have had knowledge of the claim, and Farrel had a right to assume that they had knowledge when the representations were made to him. The bank knew for what purpose he sought the information, and knew that he was induced to act upon that information in assuming the debts of the company, including its own unsecured claim of $17,300; and Farrel was in reliance upon that information saddled with a load of debt, resulting in a loss to him of more than $200,000, except what little he can get by way of dividends from the insolvent estate. It is no answer at all to say that Crane did not intend to deceive Farrel, or that he acted in good faith and the liability of the corporation was not apparent to him at the time. He did in fact deceive and mislead Farrel; his position was such that he ought to have had knowledge, and Farrel had a right to rely upon his having knowledge.

4. The law of estoppel, as laid down by Lord DENMAN in the leading case of *Pickard* v. *Sears*, 6 Ad. & E., 469, has been generally recognized by the courts of this country. But the same eminent authority in the later case of *Gregg* v. *Wells*, 10 Ad. & E., 90, said that the doctrine of the former case might be stated more broadly. A party, said Lord DENMAN in the latter case, who "negligently and culpably stands by, and allows another to contract on the faith and understanding of a fact which he can contradict," will not afterwards be permitted to dispute that fact against the person deceived. See *Freeman* v. *Cooke*, 2 Exch. Rep., 654. *Pickard* v. *Sears* was an action at law, and it has been called a leading case, because Lord DENMAN gives a definition of estoppel which has been generally adopted in the courts in this country. But courts of equity in England,

long before the case of *Pickard* v. *Sears*, held that it was
not necessary that there should be an intention to deceive
or mislead, or even a knowledge that the representation was
false, to create an equitable estoppel.   13 Viner's Abr., 539;
*Hunsden* v. *Cheyney*, 2 Vern., 150; *Burrowes* v. *Lock*, 10
Ves., 470.   In some states in this country the courts have
held that there must be an intention to deceive, or that the
person making the false representations must have knowl-
edge that they were false.   That may be a general rule in a
large class of cases at law, but the exceptions are so numer-
ous that the weight of authority is altogether against this
narrow construction of the law of estoppel.   He who from
his position ought to have knowledge, and who holds himself
out to another as having knowledge, cannot set up his good
faith, or his want of knowledge or intention to deceive,
against one to whom he made the false representation that
he had knowledge, and who had a right to believe the
former had knowledge when he made the representation.
If the other elements of an estoppel are found, as is con-
ceded in this case, a party situated as the president of this
bank was, cannot relieve the bank from the consequences of
his false representation, by showing that he had no intention
to deceive.   This is a case of equitable estoppel, and an
estoppel of this kind is not odious in the eye of the law as
tending to shut out the truth.   The higher spirit of the law
of equity looks upon such an estoppel with favor, because it
secures and establishes equity and good conscience and good
faith in transactions between men.   There is a host of well-
considered decisions in this country since the law of *Pickard*
v. *Sears* was enunciated, where the doctrine of equitable
estoppel has been held to bind a party by his representations,
when there was no intention to mislead; and when the
element of bad faith in making such representations is
entirely wanting.   And corporations, as well as individuals,
are bound by the representations of their proper officers;
and cannot hold up the want of knowledge, or the absence
of an intent to mislead, on the part of such officers, as a de-
fense against the effect of such representations.   It is not

necessary that there should be any design to mislead, to create an equitable estoppel. *Hall* v. *Fisher*, 9 Barb., 17; *Welland Canal Co.* v. *Hathaway*, 8 Wend., 480; *Manufacturers' & Traders' Bank* v. *Hazard*, 30 N. York, 230; *Brown* v. *Bowen*, id., 541; *Erie Co. L. Bank* v. *Roop*, 48 id., 292, 298; *Isham* v. *Buckingham*, 49 id., 222; *Continental National Bank* v. *Bank of the Commonwealth*, 50 id., 575; *Blair* v. *Wait*, 69 id., 116; *Hicks* v. *Cram*, 17 Verm., 449; *Strong* v. *Ellsworth*, 26 id., 366; *Louks* v. *Kenniston*, 50 id., 116; *Greene* v. *Smith*, 57 id., 268; *Simons* v. *Steele*, 36 N. Hamp., 79; *Davis* v. *Handy*, 37 id., 65; *Drew* v. *Kimball*, 43 id., 282; *Horn* v. *Cole*, 51 id., 287; *Guffey* v. *O'Reiley*, 88 Mo., 418; *Buchanan* v. *Moore*, 13 S. & R., 306; *Chapman* v. *Chapman*, 59 Penn. St., 214; *Miller's Appeal*, 84 id., 391; *Belgian Glass Co.* v. *Pabst*, 101 N. York., 621. In Massachusetts the courts for a long period were disposed to limit this doctrine of estoppel and to require evidence of an intent to mislead, or knowledge involving an element of bad faith, to create it. But the recent decisions of their highest court give it a much broader application. *Commonwealth* v. *Reading Savings Bank*, 137 Mass., 431; *Holden* v. *Phelps*, 141 id., 456; *Tracy* v. *Lincoln*, 145 id., 357. *Horn* v. *Cole*, above cited, is one of the best considered cases upon this subject in this country. PERLEY, C. J., in an exhaustive opinion, in which the cases in England and in this country are analyzed and compared, points out the distinction between equitable estoppels, and other legal estoppels which are stigmatized as odious in shutting out the truth, with great clearness and force. He says that "the cases are numerous where the party who was estopped by his declarations or his conduct to set up his legal title, was ignorant of it at the time, and of course could have had no actual intention to defraud by concealing his title. Yet, if the circumstances were such that he ought to have informed himself, it has been held to be contrary to equity and good conscience to set up his title, though he was in fact ignorant of it when he made the representations."

5. This court more than forty years ago adopted the law

of estoppel as laid down in *Pickard* v. *Sears;* and it has recognized the doctrine of equitable estoppel in its broadest sense. It has been settled law in this state since the case of *Roe* v. *Jerome*, 18 Conn., 153. See *Middletown Bank* v. *Jerome*, 18 Conn., 443 ; *East Haddam Bank* v. *Shailor*, 20 id., 21 ; *Whitaker* v. *Williams*, id., 103 ; *Dyer* v. *Cady*, id., 568 ; *Preston* v. *Mann*, 25 id., 128, 130 ; *Collins* v. *Tillou*, 26 id., 368 ; *Calhoun* v. *Richardson*, 30 id., 210 ; *Main* v. *Brown*, 56 id., 345. In *Preston* v. *Mann*, STORRS, J., says : " The doctrine of *estoppel in pais*, notwithstanding the great number of cases which have turned upon it, and are reported in the books, cannot be said even yet to rest upon any determinate legal test which will reconcile the decisions or will embrace all transactions to which the great principles of equitable necessity, wherein it originated, demand that it should be applied. In fact it is because it is so purely a doctrine of practical equity that its technical application is so difficult and its reduction to the form of abstract formulas is still unaccomplished." Farther on, in referring to the case of *Pickard* v. *Sears*, he says the word ' willfully,' as used in this connection, is not to be taken in the limited sense of the term *maliciously* or of the term *fraudulently*; nor does it of necessity imply an active desire to produce a particular impression, or to induce a particular line of conduct." He says there are " cases where the excuse of ignorance cannot be permitted to avail, without defeating the very principle of justice upon which the doctrine of estoppel is founded." In the very recent case of *Main* v. *Brown*, *supra*, in which the present chief justice gives the opinion, where silence of the party was held to estop him, it did not appear that at the time of that silence which induced the other party's action, he had any intention to defraud him, or even that he remembered the limitation in the contract he afterwards undertook to set up.

*J. W. Webster* and *J. C. Lay* of New York, for the appellees.

1. The probate court has no power to discriminate be-

tween creditors of the same class, unless by the application of some well-settled doctrine of equity jurisprudence. *Waterman's Appeal from Probate*, 26 Conn., 96; *Ashmead's Appeal from Probate*, 27 id., 241; *Vail's Appeal from Probate*, 37 id., 185. Before discussing the authorities on the subject it should be observed that there is no difference between the claims of the bank and those of all other creditors. All are founded upon good consideration, stand upon an equal footing, are simple contract debts of the same class, and are entitled as matter of course to the dividend payable by the trustees. The interference of the court of probate to prevent the payment of a dividend to a creditor whose claim has been legally established, would be practically to nullify the decisions of the courts establishing the claim, and place in the probate courts a power superior even to that of the highest court of the state. It was decided in *Waterman's Appeal* and *Ashmead's Appeal* that these courts had authority to declare that one class of creditors had a priority over another class of creditors. Such decisions were based upon a general notion of justice and equity, not apparently springing from any known doctrine of equity jurisprudence. It is not surprising therefore that the conclusions of the court in *Ashmead's Appeal* were severely criticised in *Vail's Appeal*. In the latter case, it was held that a court of probate has power to go behind the report of commissioners upon insolvent estates and marshal the general claims reported by them according to such equities as may justly, *upon settled principles of equity*, give some claims or classes of claims a preference over others. In that case BUTLER, C. J., used the following language:—" The judge of the court of probate is not a chancellor. He possesses chancery powers, but they are only such as are incidental, connected with the settlement of a particular estate and necessary for the adjustment of equitable rights, and not to find and enforce equities in the ordinary and loose sense in which that term has come to be used in the law. If there are trusts to be connected with the property, or liens upon it, or priorities enforceable in equity, if through fraud, accident or mistake,

a class of creditors or beneficiaries are entitled of right to relief as against other creditors or beneficiaries, he may marshal or distribute the assets so as to enforce or satisfy the right. But it must be a right, one which a court of equity would take cognizance of and enforce, if application could be made to such a court. * * * It is not easy to discover what right existed on which a priority in favor of one class of creditors against the Grove Car Works could be founded. The court of probate did not find any precise right, and seems to have been governed by a general sense of equity. The facts of the case, so far as they appear, do not show such right; nor is it easy to discover what precise right the Supreme Court found in *Ashmead's Appeal.* * * * Judges of probate should understand that they are not to decree priorities between classes of creditors whose claims are allowed by commissioners, nor in any case, on any loose impressions of justice and equity, nor unless such priority is founded on a clear, definable and specific equitable right, recognized as such in equity jurisprudence, and one which a court of equity could and would protect and enforce, if application could be lawfully made to such court therefor." We fail to find any authority for the proposition that one creditor of an insolvent estate can prevent another creditor of the same class from participating in the assets of the estate by reason of a pretended equity. The court of probate is not a tribunal to settle controversies between creditors of the same class. The court is asked here to determine that, as between the bank and Farrel, it is contrary to justice and equity that the bank should receive its dividend. It seems to us that the petitioners are relying upon that loose notion of justice and equity clearly referred to in *Vail's Appeal.* Courts of probate have no jurisdiction to deprive a creditor of a dividend unless the claim to priority is founded upon a definable and specific equitable right which a court of equity would enforce. How can one creditor avail himself of this claim of estoppel, to the exclusion of, or to a greater extent than, any other creditor of the same class, in view of the facts found by the court in this

case? The trustees represent the corporation and the creditors as well. The claim upon which the bank seeks to recover its dividends, is for money advanced to and used by the corporation, and has gone into, and constitutes a part of, the *very assets* from which alone any dividend whatever can be paid. There is no pretense that the indebtedness of the corporation has been increased or its assets diminished a farthing by reason of any act of the bank, nor that its assets have been increased or its indebtedness diminished a farthing by reason of any moneys advanced or services rendered by Farrel. The finding shows that he paid nothing *before* the assignment which was not repaid to him, and that all that he paid *after* the assignment, and all the obligations he assumed and became responsible for in any way, have been proved and allowed against the estate, in *his own name or that of some other claimant.* We submit that the petitioners have shown no equitable right and are entitled to no equitable remedy.

2. Estoppel by conduct or equitable estoppel presupposes or implies fraud or deceit. It is impossible to discover fraud or culpable negligence in the finding. Bigelow on Estoppel (3d ed., 476) says:—" The estoppel to be considered might perhaps be appropriately designated estoppel arising from misconduct. In its most typical phase, it is founded upon deceit and has its jurisdiction in the justness of preventing the accomplishment of fraud. The origin of the estoppel is probably to be found in the doctrine of equity that if a representation be made to another, who deals upon the faith of it, the former shall make the representation good, if he knew it to be false." Bigelow enumerates the elements which constitute estoppel by conduct, as follows:—" The cases when carefully analyzed show that all of the following elements must actually or presumably be present in order to an estoppel by conduct:—1. There must have been a false representation or a concealment of material facts. 2. The representations must have been made with knowledge of the facts. 3. The party to whom it was made must have been ignorant of the truth of the matter. 4. It must have been

made with the intention that the other party would act upon it. 5. The party must have been induced to act upon it." The authorities in this state do not conflict with the above general principles. *Roe* v. *Jerome*, 18 Conn., 138; *Whitaker* v. *Williams*, 20 id., 98; *Preston* v. *Mann*, 25 id., 118; *Taylor* v. *Ely*, id., 250; *Danforth* v. *Adams*, 29 id., 107; *Walker* v. *Vaughn*, 33 id., 577; *Winton* v. *Hart*, 39 id., 16; *Kinney* v. *Whiton*, 44 id., 262. In *Preston* v. *Mann* the court uses this strong language :—" Whatever the motive may be, when one so acts or speaks that the natural consequence of his words and conduct will be to influence another to change his condition, he is legally chargeable with the intent or willful design to induce the other party to believe him and to act upon that belief, if such proves to be the actual result." This language was criticised in *Danforth* v. *Adams*, as follows :—" The defendants were sued as partners and were found by the Superior Court to be liable as such, although it was found as a fact that they had not been in partnership. This result was arrived at on the ground that certain acts and declarations of the defendant Fuller, though not intended to induce a belief in the existence of the partnership, yet as they were well calculated to induce such a belief, and such was their natural consequence and effect upon persons generally, and the plaintiff was led by them to believe that the defendants were partners and to give them credit as such, estopped him from showing that he was not a partner. Under the circumstances of this case I think the court came to the wrong conclusion. * * * The court was governed undoubtedly by what was supposed to be the principle involved in the case of *Preston* v. *Mann*, in which it was said that where the natural consequence of the words or conduct of a party will be to influence another to change his conduct, he is legally chargeable with an intent or design to induce the other to believe him and to act upon that belief if such prove to be the actual result, whatever his motive may be. As applicable to that case the proposition was very correctly stated. But it was stated with the caution which becomes a statement of a principle liable to be

misapplied, and the court commenced its discussion of that part of the case with the remark that, in sustaining the charge of the court below, it might be approaching the verge of the law." See also remarks of PARK, J., in *Ives* v. *North Canaan*, 33 Conn., 402. Attention is called to the language used in the above three cases, in order to point out clearly that an estoppel will not be raised in every case where conduct or silence was calculated to mislead. Estoppel does not exist in the absence of a willful or intentional design to mislead. The principle is also laid down in *Danforth* v. *Adams*, that where there is no willful deception or culpable negligence, and no intention that the representation should be acted on as true, the person making the declaration or doing the acts is not estopped from proving the truth. It is also well settled in Connecticut that, to render the principle of estoppel applicable, the person estopped must have knowledge of his rights and of all the facts bearing upon the subject. *Whitaker* v. *Williams*, 20 Conn., 98. Now let us examine the facts of this case in the light of the above familiar principles.—1st. The bank acted in good faith. The finding is that "Mr. Crane acted in good faith in his statement to Mr. Farrel." It is also found that the liability of the corporation on the notes in question, not mentioned at that interview, did not become apparent to Mr. Crane until afterwards. In other words, Mr. Crane in this interview acted in entire good faith, honestly believing that the personal notes of Wm. H. Brown were not obligations of Brown & Bros. There is clearly an absence of that willful intention to deceive, or that gross negligence amounting to positive fraud, which is one of the essential elements of estoppel. Nor is there anything unreasonable or improbable in the facts. The bank had never asserted its claim upon the notes of Wm. H. Brown until the latter part of the year 1885, and shortly before the assignment in insolvency. It is an undeniable fact that the bank did not regard these notes as obligations of Brown & Brothers at the time of this interview with Farrel, nor did the directors of Brown & Brothers regard these notes as obligations of the

corporation. It was not until a special investigation was made about the time of the insolvency of Brown & Brothers in the latter part of the year 1885, that it was discovered and known to the bank that these moneys had been used for the benefit of Brown & Brothers in the payment of its obligations.—2d. Mr. Farrel was induced to enter into this contract quite as much by the representations of Brown & Brothers that the amount of claims held by the bank was limited to $17,300. There was no willful concealment by either the bank or the committee of stockholders. If Mr. Farrel was misled, he was also influenced by statements of the company. The findings say:—"The statements (of assets and liabilities made out by the company, in which the debt to the bank was put in at $17,300,) were shown Mr. Farrel." "He then visited all the other banks holding Brown & Brothers' paper and found that the indebtedness of the company to these banks corresponded with the list of the indebtedness given him by the company." The finding further says:—"I find that it was upon the understanding and belief by Farrel that the indebtedness of the company did not exceed the amount that had been so represented to him, and that the defendant's claim against the company did not exceed the amount of $17,300, that Farrel was induced to and did enter into the arrangement with the company and make the contract." It is clear from the use of this language that the statements of liabilities furnished Farrel by the company induced him to enter into the contract, and the officers of the company and of the bank were equally mistaken as to the character and validity of the claim of the bank upon the notes in question. Can estoppel be raised from silence induced by such an honest mistake? Can a creditor be deprived of a valid claim because the liability of the corporation was not then known or established?—3d. The bank is not chargeable with negligence. There is no evidence to warrant the conclusion that the bank was equitably bound to know whether or not the corporation was liable upon the notes in question. Under the authorities, culpable or gross negligence is predicated upon knowledge by a party of his

rights. In *Winton* v. *Hart*, 39 Conn., 16, BUTLER, C. J., states the rule as follows:—"It is well settled that a man cannot lawfully keep silent when it is his duty to speak, to prevent a wrongful use of his property or credit to the injury of an innocent third person. He cannot therefore be permitted to keep silent when he knows that his property is being fraudulently sold by another as his own, without warning the innocent purchaser, or when he knows that his credit is being fraudulently used by an irresponsible person in the purchase of goods, without notifying the vendor of the fraud. To do so is culpable negligence and as much an element of estoppel as active misconduct or misrepresentation." In *Roe* v. *Jerome*, 18 Conn., 138, the court uses language indicating that culpable negligence presupposes knowledge. WILLIAMS, C. J., said:—"And even if a party negligently or silently stands by and allows another to contract on the faith and understanding of a fact which he can contradict, he cannot afterwards contradict that fact as against the person who may be injured." There are cases, however, where parties have been held to be guilty of such gross negligence that they cannot set up want of knowledge, as for example where a party to a promissory note stated that it was a good note and would be paid at maturity or certifies that certain notes "are good, true, business notes," or where misrepresentations are made by a party who is consciously ignorant of the matter to which they relate at the very time that he professes a full knowledge of it. *Preston* v. *Mann*, 25 Conn., 118; *Roe* v. *Jerome*, 18 id., 138. Apart, however, from a willful and deliberate assumption of knowledge, where the party is really ignorant, it may be broadly stated that knowledge of a party's rights must be shown in order to make out a case of estoppel arising from suppression of the truth.

3. Mr. Farrel has no standing in a court of equity. 1st. He has no standing as a creditor. An insuperable objection to any relief asked for by or on behalf of Farrel is found in the fact that according to the terms of his contract he is not entitled to repayment of any money advanced until the

indebtedness existing against the company on the 23d day
of August, 1884, "shall be paid or provided for or assumed
by said Farrel and said company relieved from liability
thereon." The record shows that Farrel never advanced a
dollar in payment of the obligations of the corporation or for
any other purpose until after the assignment. The finding
on this subject is as follows:—"I do not find, however, that
Farrel advanced to the company any money of his own,
except in small sums repaid to him, or paid out of his own
means any indebtedness of the company, until after the
assignment. * * * He has paid (but since the assignment)
a large amount of the indebtedness of the company, and is
held as indorser upon the remaining bank notes of the com-
pany, so that what he has paid and what he is liable to pay
will amount to about $200,000." The petition signed by
Farrel states that "claims were presented and allowed
against said estate within said time to the amount of more
than $300,000, unsecured by the corporation, of which
claims Franklin Farrel was indorser or surety to the amount
of more than $200,000, and is liable to pay the same in full."
It is therefore clear that Farrel has not only not paid the
indebtedness of the company in full, but has not even yet
paid the bank notes which he has indorsed. It is not stated
and is not known how much Farrel has actually assumed
and how much he has actually paid. There is certainly
$100,000 still outstanding not yet indorsed by him. His
rights as a creditor of the estate are fixed by the agreement
under which he loaned the money. It is certain he could not
have sued for his advances without meeting the objection now
urged. If he could not sue, his proof of debts as a creditor
would on proper application to the court of probate be ex-
punged. At all events, we can attack his right and stand-
ing as a creditor as a defense to his proceeding to deprive
us of our dividend.—2d. Farrel has failed to do equity.
The finding that the allegations of the defendant in the last
half of the third paragraph and in the fourth paragraph of
its answer are untrue, relates only to charges of mismanage-
ment and negligence of Farrel. The court thereby simply

refused to find that the losses to the stockholders were due
to Farrel's mismanagement and negligence, but there is no
finding that Farrel performed his contract.   Indeed, the
evidence of non-performance of the contract by Farrel
is overwhelming.   He did not pretend to carry out the
letter of the contract; he certainly never fulfilled its spirit.
His policy, diametrically opposed to the terms and spirit of
the agreement, was to renew and extend all paper of Brown
& Bros. with his indorsement, and let the assets pay the
debts.   The effect of this policy was not to place the com-
pany upon a safe and reliable basis for the continuance of
its business.   Had Farrel actually advanced the money to
pay off the indebtedness of the company, as he agreed in
plain terms to do, or had he invested even $100,000 in cash
in the business, there is no question but that the company
would have sprung into life, and would to-day be solvent
and prosecuting a successful business.   The finding conclu-
sively shows that Farrel's connection with the corporation
has been nothing but an unmitigated misfortune and injury
to the corporation and its creditors.   It would have been
far better for the creditors if the corporation had made an
assignment in 1884, instead of making this contract with
Farrel, which only served to tie its hands, and prevent the
possibility of making or accepting any other mode of relief
from existing embarrassments, and which, by reason of Far-
rel's failure to perform his covenants, proved of no value
whatever to the corporation or its creditors.   It should be
borne in mind that it was not at the solicitation of the bank
that Farrel entered into this contract.   The bank simply
agreed with other stockholders to contribute its propor-
tionate share of stock in consideration of the promises and
undertakings of Farrel.   The bank fully performed its
promise, according to the terms of the contract.   In view
of the fact that he has not performed his agreement, and
has not been of the slightest advantage to the corporation
or its creditors, but a great injury; in view of the fact that
he has not added a farthing to the assets or diminished the
indebtedness a farthing; in view of the fact that the bank

transferred to Farrel its proportion of the stock as agreed in the contract; and in view of the fact that the bank, as found by the court, has acted in good faith throughout the entire transaction—is not the position of Farrel before this court entirely without precedent, justification or excuse?

PARDEE, J. In February, 1886, Brown & Brothers, a corporation located within the probate district of Waterbury, went into insolvency; the appellants Chase and Lewis were appointed trustees of its assigned estate; and commissioners were appointed to receive and pass upon such claims as might be presented against it.

The National Shoe & Leather Bank of New York, the appellee, and Franklin Farrel one of the appellants, claimed to be the chief creditors. The bank presented as claims in its favor three notes aggregating $29,900; Farrel presented claims in his favor amounting to about $175,000. The appellants denied that the claim of the bank was against the corporation of Brown & Brothers, and insisted that it was against one William H. Brown.

The commissioners, finding that the claim of the bank was against Wm. H. Brown, rejected it. The bank appealed to the Superior Court from the doings of the commissioners in disallowing its claim. That court, upon hearing, found that its claim was against the corporation of Brown & Brothers, reversed the finding of the commissioners, and allowed the claim against the estate of the corporation. The trustees appealed from the judgment of the Superior Court to this court, and this court affirmed the action of the Superior Court. Thus the claims of the Shoe & Leather Bank, to the extent of said sum of $29,900 against the estate of the corporation, became fixed by judgment of court, conclusive upon all parties as to the amount; all interests being represented; the Shoe & Leather Bank on one side, the trustees, representing all other creditors, upon the other.

The trustees having reduced the assets into money hold it as a fund in trust for the equal benefit of all creditors

whose claims have been duly presented and allowed, or established by final judgment of court unappealed from. But when the probate court reached the final act of division of the fund it was found that it was less than the amount of the debts. Therefore the trustees and Farrel, alleging that it would be grossly unjust and contrary to equity and good conscience to pay anything to the bank until the claims of Farrel for obligations assumed by him in favor of the corporation under his contract, trusting to the representations made by the bank as to the amount of the indebtedness of the corporation to it, should be paid or satisfied, applied to the probate court for an order directing the trustees to pay the claims of Farrel before paying any dividend to the defendant.

The probate court upon hearing dismissed the application. The trustees and Farrel appealed to the Superior Court, and that court has reserved the question for the advice of this court.

What we have thus far called the Farrel claim is made up of claims presented by sundry banks upon paper indorsed by Farrel for Brown & Brothers, under a contract made by him on the 23d of August, 1884, the facts with regard to which will be more fully stated hereinafter; but since the report of the commissioners allowing these claims to the parties presenting them was made, Farrel has paid or assumed all the indebtedness upon which these claims were based, and is now the owner of the claims so allowed and entitled to the dividend thereon. To save unnecessary verbiage we shall therefore call this entire class of claims, Farrel's claim. He had in addition a claim of his own, not connected with these transactions, of about $20,000, which was presented by him and allowed.

The principal question in the case is this:—Is it within the power of the probate court to determine whether or not, upon the facts found, there is an equitable estoppel which will prevent the bank from receiving any dividend upon its claim of $29,900, until Farrel has received upon his claim for moneys advanced to and liabilities assumed for Brown

& Brothers the full dividend that he would have received if
the bank's claim of $29,900 had not been presented or allow-
ed.    And if such an equitable estoppel exists, can the pro-
bate court enforce it?

Of course back of all this lies the question whether, upon
the facts found, there exists such an estoppel as would be
recognized and enforced by a court of equity.    This ques-
tion it is for us to determine.

Upon the institution of proceedings in insolvency and the
appointment of trustees as agents of the law to take the
assets, convert them into money and divide them *pro rata*,
the right of each creditor to enforce his claim by proceedings
in courts of law went into abeyance; practically one suit
had been commenced for all in the probate court.    Commis-
sioners determine, in the first instance, the amount of each
creditor's claim ; from their determination there is an appeal
to the Superior Court upon questions of law and fact; and
from the latter upon questions of law to the Supreme Court.
As soon as the aggregate amount of all claims is finally
determined, it is the duty of the probate court to divide the
fund.    In making the division it exercises the powers of a
court of chancery of general jurisdiction.    It can find and
enforce an equitable estoppel in favor of one and against
another creditor as fully as would the Superior Court upon
a bill in equity for the like purpose.    The principles and
rules of law are the same in each court.

There must be in the probate court such facts as would
be required in the Superior Court and the rules and prin-
ciples of equity must have the same application.    An appeal
lies from the probate to the Superior Court and to this
court ; alike, whether the question came originally from the
probate or from the Superior Court, this court furnishes the
rule of law upon the facts found, and the rule is the same,
regardless of the question as to which court made the deter-
mination appealed from.

Inasmuch as the statute has committed the settlement of
the estates of insolvent corporations and persons to the
probate court, the advice of this court passes through the

Superior to the probate court, and is by the latter embodied in a final decree. There is the symmetrical completion of a matter in the court in which it commenced. *Waterman's Appeal from Probate*, 26 Conn., 96; *Ashmead's Appeal from Probate*, 27 id., 241 ; *Vail's Appeal from Probate*, 37 id., 185.

In August, 1884, the corporation of Brown & Brothers was financially embarrassed. The Shoe & Leather Bank was one of its stockholders. A committee of stockholders asked Farrel to pledge his credit, use his money, and exercise his financial ability, industry and energy in rescuing the corporation from ruin, for a consideration to be paid to him. Before acceding to their request he endeavored to make certain to himself the amount of its indebtedness. In this effort he applied to the Shoe & Leather Bank, a creditor, to state to him the amount of the corporate indebtedness to it. The bank had full knowledge of his purpose in asking and intended that he should rely upon its answer. Presumably it would derive benefit from Farrel's indorsement of the Brown & Brothers' notes for $17,500 held by it, overdue and protested. With this knowledge and intention the bank stated that the amount was $17,500. Trusting to this answer as revealing the utmost extent of the liability of the corporation to the bank, Farrel acceded to the request of the stockholders, assumed debts of the corporation, undertook its management, pledged his credit, gave it of his time and ability; and as a consequence suffered large pecuniary loss.

The indebtedess of Brown & Brothers to the bank for the $29,900 in question existed prior to the time of Farrel's inquiry and was then evidenced by three notes under protest. Since that time there has been no change : the liability of maker and indorser remains as at the protest. Upon that liability the bank has since taken and now seeks to enforce a judgment against Brown & Brothers. What the bank now knows and asserts through a judgment of court obtained by it it knew when Farrel inquired. Whether or not its agent answered Farrel with knowledge or in good faith, is quite immaterial. For the purposes of this case the bank, once in possession of that knowledge, of

legal necessity always has it. Its officers or agents may forget, but the corporation always remembers. They may fall into errors either as to law or fact; nevertheless, knowledge remains with the corporation. Having knowledge that Brown & Brothers was its debtor upon these three notes, it could not either truthfully or safely say otherwise to Farrel.

Moreover, it is found that if the answer had included the notes for $29,900 Farrel would not have entered into the contract. He was shut up to an inquiry of the bank for the facts relative to the indebtedness of Brown & Brothers to it; it alone could give him the information. Knowing the reason for his inquiry and that his action would depend upon its answer, there were two courses open to the bank— to answer, or to decline to answer. It answered, giving a limit, making no suggestion of a possibility as to more. It assumed to know exactly; verifying its statement by its discount clerk; giving Farrel no reason to doubt that it spoke upon certain knowledge. The answer under such circumstances involved a declaration of all knowledge upon the subject, a willingness to communicate it, and a consent that he might make it the basis of action. It is as if an intending purchaser, stating the purpose of his inquiry and his intention to be governed by the answer, had inquired of the bank the extent of an unrecorded lien in its favor upon property, and the bank had made an answer upon which it desired and intended the inquirer to act.

Upon principles of equity and good conscience well established in this and other jurisdictions, the bank, having declared that it had knowledge, and thereby intentionally led Farrel to a course of action resulting in his pecuniary loss, is not now to be permitted to say, as against him, that it had not knowledge.

In *Roe* v. *Jerome*, 18 Conn., 138, the marginal note is:— "Where one person by his words or conduct causes another to believe in the existence of a certain state of things, and thus induces him to act on that belief, so as to injuriously affect his previous position, he is concluded from averring a different state of things as existing at the time." In

*Middletown Bank* v. *Jerome*, 18 Conn., 443, the marginal note is :—"If a person by his words or conduct intentionally induces another to believe a fact, and upon its truth to commit his interests, he shall not be permitted afterwards to deny that fact in order to throw off responsibility." In *Preston* v. *Mann*, 25 Conn., 118, an intending purchaser asked one of the defendants if a specified note was the genuine note of his firm, and was told that it was. The inquirer thereupon purchased it. The defendant was estopped from saying that he answered ignorantly. In the marginal note of this case the decision of the court upon this point is stated as follows :—

"In this state, and in the courts of this country and of England generally, the proposition of Lord DENMAN (*Pickard* v. *Sears*, 6 A. & E., 469,) seems to have met with approbation—that, where one by his words or conduct willfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief so as to alter his own previous position, the former is concluded from averring against the latter a different state of things, as existing at the time.

"The word 'willfully' as used in this connection is not to be taken in the limited sense of the term 'maliciously,' or of the term 'fraudulently,' nor does it of necessity imply an active desire to produce a particular impression or to induce a particular line of conduct.

"Whatever the motive may be, one who so acts or speaks that the natural consequence of his words or conduct will be to influence another to change his conduct, is legally chargeable with an intent or willful design to induce the other to believe him and to act upon that belief, if such prove to be the actual result.

"Inasmuch as the doctrine of estoppel especially concerns conscience and equity, ignorance, unaccompanied with culpability of any kind, ought to excuse conduct and language which would otherwise render the author justly responsible for the injury resulting to another who had placed confidence in them.

" There are cases, however, where the excuse of ignorance cannot be permitted to avail without defeating the very principle of justice upon which the doctrine of estoppel is founded.

" It would seem that where the alleged ignorance involves gross culpability, there should be a limit to the facility with which a party, whose words or conduct have misled another to the latter's injury, should be permitted to qualify his responsibility by pleading his own fault."

In *Winton* v. *Hart*, 39 Conn., 16, the defendant, who, with knowledge that an irresponsible person without authority from him was purchasing goods upon his credit, remained silent, was estopped from denying his liability to pay for them.

In no case has this court failed to apply an estoppel to a declaration made with assumed knowledge as to facts, with knowledge that it would and intention that it should be acted upon, when it was acted upon and loss resulted. In *Whittaker* v. *Williams*, 20 Conn., 98, it was not applied, for the reason that the person to whom the declaration was made had equal knowledge with the person making it, and was not thereby induced to act differently from what he otherwise would have done; not in *Taylor* v. *Ely*, 25 Conn., 250, for the reason that the person sought to be estopped refused to answer a question and left the inquirer to act at his own risk; not in *Danforth* v. *Adams*, 29 Conn., 107, where a clerk spoke of the business of his principals as " our business," for the reason that there was neither culpable negligence in so speaking, nor any intention that the words spoken should be acted upon by the hearer; not in *Walker* v. *Vaughn*, 33 Conn., 577, for the reason that " no represen-tations were made which were intended or calculated to influence or mislead the petitioner, and it does not appear that his course was affected by the answer; " nor in *Kinney* v. *Whiton*, 44 Conn., 262, for the reason that the person who set up the estoppel was a bystander who overheard a declaration made to another for the purpose of influencing the conduct of the latter, and not intended for others.

In *Horn* v. *Cole*, 51 N. Hamp., 287, it is said of the doctrine of equitable estoppels, that "having been borrowed from equity, courts of law that have adopted it should obviously look to the practice in equity for their guide in the application of it; and in equity the doctrine has been liberally applied to suppress fraud and enforce honesty and fair dealing, without any attempt to confine the doctrine within the limits of a strict definition. For instance, the doctrine has not in equity been limited to cases where there was an actual intention to deceive. The cases are numerous where the party who was estopped by his declarations or his conduct to set up his legal title, was ignorant of it at the time, and of course could have had no actual intention to deceive by concealing his title. Yet if the circumstances were such that he ought to have informed himself, it has been held to be contrary to equity and good conscience to set up his title, though he was in fact ignorant of it when he made the representations." See also *Wells* v. *Pierce*, 27 N. Hamp., 503 ; *Davis* v. *Handy*, 37 id., 65 ; *Drew* v. *Kimball*, 43 id., 282.

In *Continental Bank* v. *Bank of the Commonwealth*, 50 N. York, 575, the court said :—" We hold that there need not be, upon the part of the person making the declaration or doing an act, an intention to mislead the one who is induced to rely upon it. There are cases in which parties have been estopped where their acts or declarations have been done or made in ignorance of their own rights, not knowing that the law of the land gave them such rights. Here certainly there could be no purpose to mislead others, for there was not the knowledge to inform the purpose, and both parties were equally and innocently misled. *Storrs* v. *Barker*, 6 Johns. Ch., 166. Indeed it would limit the rule much within the reason of it, if it were restricted to cases where there was an element of fraudulent purpose. In very many of the cases in which the rule has been applied there was no more than negligence upon the part of him who was estopped. And it has long been held that where it is a breach of good faith to allow the truth to be shown, there

Chase's Appeal from Probate.

an admission will estop." See also *Gaylord* v. *VanLoan*, 15 Wend., 308; *Dezell* v. *Odell*, 3 Hill, 221; *Wendell* v. *Van-Rensalaer*, 1 Johns. Ch., 353; *Strong* v. *Elkworth*, 26 Verm., 366; *Eldred* v. *Hazlett's Admr.*, 33 Penn. St., 307; *Newman* v. *Hook*, 37 Mo., 207.

In Bigelow on Estoppel (2d ed.,) p. 476, it is said:—"It seems to be settled that a party's ignorance of the truth of the representation made will not remove the estoppel, if he was bound to know the fact, or if his ignorance is the result of gross negligence;" citing among other cases *Preston* v. *Mann*, 25 Conn., 118, and *Calhoun* v. *Richardson*, 30 Conn., 210. In 2 Story's Equity Jurisprudence, 12th ed., sec. 1538, it is said:—"When a party by misrepresentation draws another into a contract, he may be compelled to make good the representation if this be possible, but, if not, the other party may avoid the contract. And the same principle applies, although the party making the representation believed it to be true, if in due discharge of his duty he ought to have known the fact."

In *Jordan* v. *Money*, 5 House of Lords Cases, 185, Lord Chancellor CRANSWORTH said:—"Nay, more, I think the principle has been carried, and may be carried much further; because, I think, it is not necessary that the party making the representation should know that it was false; no fraud need have been intended at the time. But if the party has unwittingly misled another, you must add that he has misled another under such circumstances that he had reasonable ground for supposing that the person whom he was misleading was to act upon what he was saying. It will not do if he merely said something, supposing it to be quite right, that some stranger having heard and acted upon it should afterwards come to him to make it good." In *Ainslie* v. *Medlycott*, 9 Ves., 13, Sir WILLIAM GRANT, M. R., said:— "No doubt by a representation a party may bind himself just as much as by an express covenant. If knowingly he represents what is not true, no doubt he is bound. If without knowing it is not true he takes upon himself to make a representation to another, upon the faith of which that other

acts, no doubt he is bound though his mistake was perfectly innocent."

It is also the objection of the defendant that Farrel has failed to carry out his contract with the stockholders of Brown & Brothers, and therefore has no standing in a court of equity. The allegations in the last part of the third and in the fourth paragraph of the bank's answers, are as follows:—

"And this creditor alleges that the said Farrel failed to fulfill the obligations assumed by said contract and in consequence of such failure the stock of said corporation became worthless, whereby the stockholders of said company, including this creditor, suffered and sustained losses and damages to a large amount. And this creditor, further answering, alleges that the said Farrel has no equity or standing in a court of equity, on the ground that he has himself failed to do equity as between him and the said stockholders, of which this creditor was one, but by gross negligence, mismanagement and failure to perform his part of said contract he has destroyed the value of stock held by said stockholders, and prevented this creditor from availing itself of the security which said stock gave to the claims against said corporation of Brown & Brothers possessed by said bank."

It is found that these allegations are untrue. It is also found that he has assumed indebtedness of Brown & Brothers to such an extent that the aggregate of what he has paid and remains bound to pay individually, is about $200,000. He did not agree to rescue the corporation from insolvency. He agreed to use his time, means, credit and financial skill in an honest effort to accomplish that result. Upon the finding, he performed his contract.

The Superior Court is advised to reverse the decree of the probate court and to direct that court to pass a decree giving that part of the claims allowed by the commissioners which is for money paid or liabilities assumed by Farrel for Brown & Brothers under his contract of August 23, 1884, a precedence over that part of the claim of the Shoe & Leather

Bank, as allowed by the Superior Court, which is represented by the three notes before mentioned, the principal of which amounts to $29,900, to the extent to which the dividends on the claims first mentioned are reduced by the inclusion of that part of the claim of the bank in the total indebtedness upon which the dividend is reckoned; but giving no preference to the former claims over any other claim allowed.

The process by which a correct result is to be reached in the application of this rule is a simple one, but we state it, in part to remove all uncertainty as to our meaning, and in part to prevent any errors in the attempt to apply the rule. The report of the commissioners is not before us and there is nothing in the finding of the court to enable us to state the amounts allowed upon the claims that are in conflict; but the finding states the amount of the moneys paid and liabilities assumed by Farrel for Brown & Brothers to be about $200,000; while that of the bank is $29,900, except as increased by the addition of interest. For the purposes of the illustration we will assume these two sums to be the correct ones. Let then a dividend be reckoned on a total indebtedness from which the $29,900 is excluded. The dividend on the $200,000 will then be the entire amount to which this claim is entitled. Let a dividend then be reckoned on a total indebtedness which includes this $29,900. This will give the dividend to be paid on all the claims, except that the difference between the dividend on the $200,000 under the first computation and that under the second computation is to be added to the dividend on that sum under the second computation and to be taken from the dividend on the $29,900; the dividend on the $29,900 contributing, and that on the $200,000 receiving this sum; thus satisfying the equity pertaining to the latter dividend as against the former without disturbing in the least the dividends on any other of the claims. This sum, when added to the dividend on the $200,000 (now owned by Farrel) and to his dividend on the separate claim for about $20,000 allowed by the commissioners, will give the total

which Farrel is entitled to receive from the estate of Brown & Brothers.

In this opinion the other judges concurred.